**EATON CORPORATION, a corporation, Plaintiff,**

v.

**APPLIANCE VALVES CORPORATION, a corporation, Thomas Krzewina, an individual, and William R. Donahue, Jr., an individual, Defendants.**

**No. L 81–42.**

United States District Court,
N. D. Indiana,
Hammond Division.

Nov. 25, 1981.

Christopher B. Fagan, Cleveland, Ohio, John F. Bodle and James V. McClone, Lafayette, Ind., for plaintiff.

Harry T. Ice, David M. Mattingly, James H. Dobson, Indianapolis, Ind., Edward N. Kalamaros, South Bend, Ind., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHARP, District Judge.

This cause having been heard on September 24, 1981 in South Bend, Indiana on the Plaintiff's Motion for a Preliminary Injunction, the Court now finds the facts and states its conclusions of law thereon as follows:

## FINDINGS OF FACT

1. Plaintiff, Eaton Corporation, is an Ohio corporation with its principal place of business in Cleveland, Ohio. Defendant Appliance Valves Corporation is an Indiana corporation with its principal place of business in West Lafayette, Indiana. Defendant Thomas Krzewina is a resident of West Lafayette, Indiana, and Defendant William R. Donahue, Jr. is a resident of Batavia, Illinois. The amount in controversy exceeds Ten Thousand Dollars ($10,000.00).

2. Plaintiff Eaton is a corporation with over 1,800 employees in its control assemblies division. In 1963 Eaton became involved in the valve business when it acquired Dole Valve Company. That company· manufactured water inlet valves for manufacturers of dishwashers, clothes washers and automatic ice makers. Plaintiff, Eaton, continued the Dole business and at the time of the suit dominated the original equipment market in water inlet valves for dishwashers, supplying all of the major manufacturers—General Electric, Whirlpool, Westinghouse, Design & Manufacturing, and others—in the United States. Singer, another manufacturer of water inlet valves, had in the past supplied some dishwasher valves ·for original equipment, but today sells such valves in the after-market for replacement, and also sells valves in the original equipment market for clothes washers and ice makers. Horton, the only other manufacturer of water inlet valves for dishwashers, sells exclusively in the after-market for replacement purposes.

3. Water inlet valves are what their name implies, valves which automatically supply water when needed for the functioning of the three appliances. They are activated by a time or other mechanism which causes an electrical current to operate a solenoid ˋcell which opens and closes the valve in order to supply the needed water. Such valves are as old as the appliance industry itself and have been the subject of many patents, expired and unexpired.

4. Defendant Donahue graduated from Geneva High School in Illinois and holds bachelors and masters degrees from the University of Illinois. Both degrees are in mechanical engineering. He worked during summers, while attending the university, doing consulting work for Helstro Corporation. One summer was spent consulting for a company designing a dishwasher. Prior to being employed by Dole Valve (then a part of Eaton) in October 1964, Defendant Donahue worked for Rough Rider Corporation which produced equipment for the

printing industry. Defendant Donahue resigned from Eaton in September 1977 and returned to Eaton in September 1979. In the two years away from Eaton he organized Donahue Manufacturing and Engineering Company. The Company developed automatic assembly equipment and a bolt drilling machine, and consulted on other equipment. While with Donahue Manufacturing he developed an in-line water filter and designed a singly solenoid ice maker valve and a single solenoid pilot-operated dishwasher and clothes washer valve. These valves were offered to General Electric and Hobart before Defendant Donahue was reemployed at Eaton. Defendant Donahue returned to Eaton because his company was not producing enough income to support his family. In his first employment at Eaton he was Product Engineering Manager for Water Valves and on his return was Chief Engineer for Appliances. He resigned his position at Eaton a second time in November 1980.

5. Defendant Krzewina is a graduate of Technical High School in Milwaukee and attended night engineering courses at Marquette and Wisconsin Universities for twelve years. Prior to employment by Plaintiff, Eaton, in May 1969, Defendant Krzewina was employed by Harnischfeger Corporation as a designer/draftsman for traveling and overhead cranes at Allstate Design and Development Corporation as a design draftsman for various products, and at Hotpoint Corporation where he worked on design and development of dishwashers, disposals and water heaters. While at Hotpoint he was the inventor of four U.S. patents—one for a coupling and vent valve for dishwashers, one for an additive dispenser for dishwashers, and two for rack designs for dishwashers. Defendant Krzewina was employed by Eaton at its Control Division at Carol Stream, Illinois in May 1969 as Sales Engineer. In this capacity with Eaton he called on the major appliance manufacturers: Frigidaire, Westinghouse, Hobart, Design & Manufacturing, Waste King, and Whirlpool. On October 1, 1979 he became Product Manager for appliance inlet valves. He resigned from Eaton in November 1980.

6. Defendant Appliance Valve Corporation is an Indiana corporation organized by Donahue and Krzewina, after leaving Eaton, for the purpose of manufacturing water inlet valves. It operates in a building in Lafayette, Indiana, leased from Design & Manufacturing Corporation, a large manufacturer of dishwashers sold under various private labels.

7. While still employed by Eaton, Donahue and Krzewina made a trip to Florida and trips to other places to discuss the establishment and financing of their proposed business venture. Donahue and Krzewina, prior to leaving Eaton, discovered that Design & Manufacturing Corporation, a manufacturer of dishwashers, would be interested in purchasing valves which they might produce. After leaving Eaton they executed an agreement with Design & Manufacturing Corporation which had been under discussion for some time prior thereto.

8. Defendants Krzewina and Donahue executed employee agreements with Eaton under the provisions of which they agreed not to disclose or use Eaton secrets or confidential information subsequent to their employment. Defendant Krzewina executed an employee agreement on April 4, 1969. Paragraph 4 of the Krzewina employee agreement provides that unless the written consent of Eaton is first obtained, Krzewina shall not disclose or use at any time either during or subsequent to his employment, any secret or confidential information of Eaton which was acquired during said employment, whether or not developed by him. Eaton has given no consent, either written or oral, to Defendant Krzewina to disclose or use secret or confidential information of Eaton acquired during his employment. The agreement further provides that Defendant Krzewina was to give Eaton any and all developments and assign all patents to Eaton.

Defendant Donahue executed employee agreements on February 16, 1972 and on August 1, 1979. The Donahue agreements

are identical in language to the Krzewina agreement.

9. Donahue and Krzewina had no agreement with Eaton that they would not seek other employment or pursue other opportunities while with Eaton, or that they had to give notice to Eaton prior to leaving, or that they would not compete with Eaton after leaving it.

10. There is no evidence to support the allegation of the complaint that Defendants Krzewina and Donahue have removed from Eaton facilities tangible trade secret assets of Eaton including Eaton appliance inlet valve drawings, material specifications, lists of suppliers, code identifications of materials, and parts themselves. Rather the evidence supports the contrary conclusion that neither Donahue nor Krzewina took any inlet valve drawings, material specifications, lists of suppliers, code identifications of materials, or parts with them when they left Eaton. Plaintiff's sole witness, McCarty, also said he had no knowledge of anything being taken by Defendants.

11. The trade secrets claimed in this case relate to water inlet valves in dishwashers. Plaintiff maintained no list of trade secrets and supplied none to its employees.

12. Water inlet valves for dishwashers perform the function of opening and closing on a cycle to admit or restrict a supply of water to the dishwasher. All of the valves are activated by electrical impulse to a solenoid cell which opens and closes the valve. Basically water inlet valves all contain the same component parts. A valve known as the Horton valve, which is sold in the after-market, is a Chinese copy of the Eaton valve. A valve known as the Singer valve is similar to the Eaton valve and is also sold in the after-market. The AVC valve which is being produced for Design and Manufacturing Corporation has parts similar to those not only in the Eaton valve but in the Singer and Horton valves. However, the parts in the AVC valve are sufficiently different from those in the Eaton valve that they are not interchangeable with those in the Eaton valve. Raymond McCar-

ty, the Production Manager of Eaton, described what he termed "deficiencies" in the AVC valve as compared to the Eaton valve. Properly, these deficiencies may be termed differences and they include the flow washer, suppressor plate, body, gasket, screen, diaphragm, spring, coil, coil terminals, armature, guide tube and C frame. The AVC valve does not incorporate any features of the Eaton valve which may properly be claimed as trade secrets of Eaton. All of the features of the Eaton valve are either disclosed in patents, expired or unexpired, or are available generally to any knowledgeable person reasonably skilled in the art from an examination of any one of the millions of Eaton valves, or the Horton or Singer valves, on dishwashers and in the after-market. Nothing in the AVC valve was clearly shown to be attributable to the appropriation of trade secrets of Eaton by the Defendants.

13. The drawings from which the AVC valve was produced were drawn by the Defendant Donahue after he left Eaton. The dimensions were established either from memory or from Singer and Eaton valves which had been obtained from Design and Manufacturing Corporation. After Krzewina and Donahue left Eaton, quotations were sought by AVC or by Design and Manufacturing Corporation on behalf of the Defendant on the basis of these drawings. None of the suppliers were furnished Eaton drawings. All of the materials used in the production of the valve of AVC are materials available generally from suppliers on the market and are commonly known as shelf items.

14. The evidence submitted at the hearing does not show that the Defendants have appropriated any trade secrets of Plaintiff. The evidence is that the design of the AVC valve was created after Defendants Krzewina and Donahue left Eaton. The design was based upon the knowledge of the two individual Defendants and information available to the public in the form of valves on the market and disclosures in patents. In light of the skill and experience of the individual Defendants which they had

gained both before and after employment by Eaton, it is clear that the AVC design was accomplished without the use of trade secrets of Plaintiff. The materials in the valve of Defendant AVC are all materials available to the public and of the character which would be supplied by vendors without the knowledge of any trade secrets of Eaton.

15. Plaintiff knew as early as January 1981 of Defendants Krzewina's and Donahue's plans. Plaintiff had a conference with its inhouse and outside counsel in February or March 1981 concerning Donahue's and Krzewina's leaving Eaton and forming their own valve company and did nothing about taking action until June 1981, at which time Defendants were in production of valves.

16. The evidence submitted at the hearing does not support any finding (a) that Plaintiff does not have an adequate remedy at law; or, (b) that the threatened harm to the Plaintiff outweighs the harm of a preliminary injunction would inflict on Defendant; or, (c) that a preliminary injunction would not disserve the public interest; or, (d) that a preliminary injunction would preserve the status quo at the time of filing suit or Defendants' first knowledge of a controversy.

## CONCLUSIONS OF LAW AND MEMORANDUM OF LAW

This is a civil action seeking damages and injunctive relief for alleged misappropriation of certain proprietary rights (trade secrets) of Plaintiff Eaton Corporation, for breach of contract not to disclose trade secrets and conspiracy to misappropriate trade secrets by Defendants, Appliance Valves Corporation, Thomas Krzewina and William R. Donahue, Jr. This case is presently before the Court on Plaintiff's Motion for Preliminary Injunction. The parties presented testimony and oral argument before this Court on September 24, 1981 and have submitted briefs on the motion.

1. The Court has jurisdiction of the parties and the subject matter of this action under 28 U.S.C. Section 1332(a)(1) and venue is proper under U.S.C. Section 1391(a) and (c).

2. The law of the forum, Indiana, is determinative of the substantive issues raised. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. A federal district court must apply the conflict of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

4. The Indiana choice of law rule for an action in tort, such as an alleged misappropriation of proprietary information or trade secrets, is unsettled. The courts in this state have almost exclusively applied the rule of *lex loci delicti*, or "the place of the tort." See, *e. g., Horvath v. Davidson*, 148 Ind.App. 203, 264 N.E.2d 328 (1970). However, the Seventh Circuit in *Watts v. Pioneer Corn Co.*, 342 F.2d 617 (7th Cir. 1965), held that Indiana's choice of law rule in the area of multistate torts to be the most significant contacts rule. Shortly after the *Watts* decision the Indiana Appellate Court applied the most significant contacts rule in a multistate tort case. *Witherspoon v. Salm*, 142 Ind.App. 655, 237 N.E.2d 116 (1968). *Witherspoon* was reversed by the Supreme Court of Indiana on other grounds and the court disclaimed the Appellate Court's choice of law in its holding. *Witherspoon v. Salm*, 251 Ind. 575, 243 N.E.2d 876 (1969). This disclaimer caused confusion over the appropriate rule to be applied in multistate tort actions. The next year the Indiana Appellate Court afforded no authority to the appellate court decision in *Witherspoon* to adopt the most significant contacts rule because of the disclaimer by the Supreme Court. *Horvath v. Davidson*, 148 Ind.App. 203, 209, 264 N.E.2d 328 (1970). In a more recent case, the Indiana Appellate Court completely ignored the *Witherspoon* decision as it stated that Indiana has long followed "the place of the tort" rule in the area of multistate torts. *Maroon v. State Dept. of Mental Health*, Ind.App., 411 N.E.2d 404 (1980).

In the Seventh Circuit's most recent opinion regarding Indiana's choice of law rule in multistate tort actions, the court declined to decide the continuing validity, if any, of the *Watts* decision. *Sharp v. Egler and Bill Hanka Auto Sales, Inc.*, 658 F.2d 480 (1981). Therefore, in light of the questionable validity of the application of the most significant contacts rule and the recent Indiana decision in the area, the applicable rule is that in an action for a multistate tort, such as an alleged misappropriation of proprietary information or trade secrets, the rule of *lex loci delicti*, or "the place of the tort" is the law which governs the resulting cause of action and which is to be applied with respect to substantive phases of torts or causes of action therefore.

5. The law of the State of Indiana is applicable in this case for the reason that the principal place of Defendant, Appliance Valves Corporation, is in West Lafayette, Indiana, at which place any alleged wrong of Defendants would have occurred.[1]

6. The issuance of a preliminary injunction is an extra-ordinary remedy and involves the exercise of a far reaching power. Therefore, it should not be used except in a case clearly warranting it and will not be available unless the plaintiff carries its burden of persuasion as to all the prerequisites. To be entitled to injunctive relief, Plaintiff has the burden of showing that (a) Plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (b) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendants; (c) the Plaintiff has at least a reasonable likelihood of success on the merits; and (d) the granting of a preliminary injunction will not disserve the public interest. *Fox Valley Harvestore v. A. O. Smith Harvestore Prod.*, 545 F.2d 1096, 1097 (7th Cir. 1976).

The Plaintiff in a trade secrets case has the burden of proving three elements to entitle him to the relief requested. First, the Plaintiff must prove the existence and ownership of a trade secret. *Nickelson v. General Motors Corp.*, 361 F.2d 196–199 (7th Cir. 1966). However, establishing the existence of a trade secret alone does not satisfy the Plaintiff's burden of proof. The Plaintiff must also prove the acquisition of the trade secret as a result of a confidential relationship and the unauthorized use of the secret. *GTI Corp. v. Calhoon*, 309 F.Supp, 762, 767 (S.D.Ohio 1969). The Plaintiff therefore must prove that the valve produced by Appliance Valves Corporation is a copy of his own product, that the method of its production was secret and that Donahue and Krzewina used the confidential information acquired during their employment by Eaton in the production of the water inlet valve. Cf., *Microbiological Research Corp. v. Muna*, 625 P.2d 690 (Utah 1981); *Venn v. Goedert*, 319 F.2d 812 (8th Cir. 1963).

7. Labeling information "trade secret" or "confidential information" is not conclusive. The Court must look to more than labels. The information which is alleged to be known by Krzewina and Donahue must be evaluated in light of the definition of trade secrets to determine if the information qualifies as a trade secret. *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979), sets forth the four requirements which must be met to establish that information is a trade

1. Plaintiff alleges that the law of Illinois should apply to this case for the reasons that the Defendants, Thomas Krzewina and William R. Donahue, Jr., were employed by Eaton in Illinois, resided in Illinois, the employee agreements were executed in Illinois, the alleged trade secrets which are the subject of this litigation originated and reside in Illinois, the drawings, patent materials and accounting data were taken from the Eaton facilities in Illinois, and the A.V.C. valve was designed in Illinois. However, the act of misappropriation, if any, occurred at the point of production which occurred in West Lafayette, Indiana. Furthermore, the law of trade secrets and misappropriation thereof in Indiana and Illinois are very similar and the application of the law of Illinois would not change the outcome of this case. See *Packard Instrument Co., Inc., v. Reich*, 89 Ill.App.3d 908, 45 Ill.Dec. 266, 412 N.E.2d 617 (1980).

secret or confidential information. Those requirements are as follows:

1. The protected matter is not generally known or readily ascertainable.
2. It provides a demonstrable competitive advantage.
3. It was gained at expense to the employer.
4. It is such that the employer intended to keep it confidential.

278 N.W.2d at 90.

 The element of secrecy is absolutely essential in establishing the protectability of trade secrets and confidential information. The Restatement of Torts, Section 757, comment b (1939) clearly reflects the importance of this requirement.

"[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

\* \* \* \* \* \*

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret."

See also, Uniform Trade Secrets Act §§ 1 et seq.

The law of trade secrets requires a showing that a business' information is secret before a court will enforce efforts to prevent disclosure or use of such information. As stated in *Smith v. Dravo Corp.*, 203 F.2d 369 (7th Cir. 1953), "Knowledge cannot be placed in the public domain and still be retained as a 'secret' . . . That which has become public property cannot be recalled to privacy." 203 F.2d at 373; see *Skoog v. McCray Refrigerator Co.*, 211 F.2d 254 (7th Cir. 1954). "The obvious cannot be secret

or confidential." *In Re Uni-Services, Inc.*, 517 F.2d 492, 496 (7th Cir. 1975). "Matters which are generally known in the trade cannot be made secret by being so labelled in an agreement." *Packard Instrument Co., Inc., v. Reich*, 89 Ill.App.3d 908, 45 Ill.Dec. 266, 412 N.E.2d 617, 623 (1980).

The characterization of information as a trade secret will also be denied if the plaintiff fails to show that the information could not have been learned by anyone skilled in the industry involved. *Motorola, Inc., v. Fairchild Camera and Instrument Corp.*, 366 F.Supp. 1173 (D.Ariz.1973). The *Motorola* court described the legitimate means by which such a person could learn the "secret" information.

[The alleged trade secrets] were also either revealed in the marketed product; fully disclosed by issued patents; generally known to those skilled in the industry or trade; or consisted of information easily acquired by persons in the industry from patents, literature or known processes. \* \* \* 366 F.Supp. at 1186.

Similarly, in *Sarkes Tarzian, Inc., v. Audio Devices, Inc.*, 166 F.Supp. 250 (S.D.Cal. 1958), *aff'd per curiam*, 283 F.2d 695 (9th Cir. 1960), *cert. den.*, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961), the court refused to enjoin the operation of a competing business by ex-employees of the plaintiff. The court found that the use of the same equipment, purchased from the same suppliers as used by the plaintiff, was not improper:

But the evidence is overwhelming that these *were not* machines built to specifications, but machines for pulling crystals \* \* \* which are advertised in catalogues by nationally known firms who sell them either from stock or modify them to suit the particular needs of a manufacturer. They were not a *secret source of supply* open only to Tarzian which he could bind his employees not to disclose to others. 166 F.Supp. at 268 (emphasis in original).

In *Nickelson v. General Motors Corp.*, 361 F.2d 196 (7th Cir. 1966), the court denied plaintiff's claim that he had a secret process which had been wrongfully obtained and

utilized by the defendant. The court noted that the process involved did not have the requisite secrecy and further that the plaintiff could not show any novel contribution to the so-called secret.

> It is, of course, possible that a combination of commonly known elements or steps can be a trade secret, but such must represent a valuable contribution arising from the independent efforts of the one claiming to have devised the new combination ... The combination must differ materially from other methods taught by the prior art. Trivial advances or differences in formulas or process operations are not protectable as trade secrets. 361 F.2d at 199.

The evidence in this case established that the "trade secrets" of Eaton are of the same nature as those considered in the *Fairchild* case. The Eaton value is a marketed product. The design can be learned by anyone who has purchased a dishwasher in which it is used. The materials and component parts can be learned in the same fashion, or can simply be obtained from the same independent suppliers which furnish the materials and parts to Eaton. Eaton did not present any evidence that its valve is somehow unique and novel in the industry and failed to show any aspect of the valve manufacture operations of AVC which uses information which is not discoverable from the marketed product or patents or which does not constitute information known throughout the industry.

■ Furthermore, while trade secrets and confidential information may be protected by an employer, the general knowledge and skill obtained by an employee during his employment belongs to that employee and can be utilized by him after terminating his employment. It is well settled that an employee, upon leaving his employment, may take with him and utilize the skill and general knowledge obtained by him during his employment. See, *Captain & Co. v. Towne*, Ind.App., 404 N.E.2d 1159 (1980); *Unishops v. May's Family Centers, Inc.*, Ind.App., 399 N.E.2d 760 (1980). The Supreme Court of Indiana succinctly stated this rule in *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 127 N.E.2d 235 (1955).

> As an incident to his business the [employer] was entitled to contract with regard to and thus to protect the good will of his business. * * * However, the same is not true regarding the skill an employee has acquired, or the general knowledge or information he has obtained which is not directly related to the good will or value of employer's business. Knowledge, skill and information (except trade secrets and confidential information) become a part of the employee's personal equipment. They belong to him as an individual for the transaction of any business in which he may engage, just the same as any part of the skill, knowledge, information or education that was received by him before entering the employment. Therefore, on terminating his employment he has a right to take them with him. 127 N.E.2d at 240.

Therefore, an employee has the right to use and expand the aptitude, skill, dexterity, mental and manual ability and other subjective knowledge that he obtained in the course of his employment. See, *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 38 A.2d 33 (1944); *Sarkes Tarzian, Inc. v. Audio Devices, Inc.*, 166 F.Supp. 250 (S.D.Cal. 1958). The reasoning underlying this rule was clearly set forth in *Continental Car-Na-Var Corp. v. Mosely*, 24 Cal.2d 104, 148 P.2d 9 (1944), where the court stated:

> Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary to follow any of the common occupations of life. Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly

been the customers of his former employer, provided such competition is fairly and legally conducted. 148 P.2d at 12–13.

The Plaintiff in this case, therefore, has a very heavy burden of showing that Krzewina and Donahue have gone beyond using general skills and knowledge resulting from years of experience in the industry and incorporated identified trade secrets of Eaton into the AVC valve. Based upon the evidence, in the record, the Plaintiff has failed to sustain that burden.

■ Other companies in the industry market appliance valves having the same essential components found in the valve Eaton alleges is secret. The claimed secrets all involve the application of principles well known or readily discernable in the water inlet valve industry. Any information claimed to be secret could have been obtained by disassembly, measurement and analysis and some components purchased from suppliers rather than being manufactured by defendant. Although the AVC valve and the Eaton valve are practically identical in function and concept, the AVC is not an exact duplicate and does not contain any Eaton trade secrets. The similarity of the final products does not constitute proof of misappropriation of trade secrets. See, *Auto Wax Co., Inc., v. Byrd*, 599 S.W.2d 110 (Tex.Civ.App.1980). Therefore, the Plaintiff has failed to present sufficient evidence that the Defendants utilized trade secrets of Eaton in the design and manufacture of the AVC water inlet valve.

■ The fact that Defendants Donahue and Krzewina may have obtained knowledge regarding the design, manufacture or marketing of water inlet valves while employed by Eaton does not prevent them from using that knowledge in competition with Eaton. There is no evidence that the Defendants took any plans or drawings from Eaton or that they used any plans or drawings at Eaton in designing the AVC valve. Rather, the design and manufacture of the AVC valve involved implementing the skill and knowledge of the Defendants and not the trade secrets of the Plaintiff.

8. Eaton also has the burden of proving that if an injunction is not issued, it will suffer immediate irreparable harm for which damages are not an adequate remedy. The mere risk of irreparable harm is not sufficient. The requisite for injunctive relief is a clear showing of immediate irreparable injury or a presently existing actual threat. See, *Continental Group, Inc., v. Amoco Chemical Corp.*, 614 F.2d 351 (3d Cir. 1980); *Ammond v. McGahn*, 532 F.2d 325 (3d Cir. 1976). As the court stated in *Standard Brands, Inc., v. Zumpe*, 264 F.Supp. 254 (E.D.La.1967):

> Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.

■ There is no conclusive evidence in the record that shows that Krzewina or Donahue have disclosed any trade secrets or have threatened to do so. The production of the AVC does not include any trade secrets of Eaton. The Defendants have merely used their skill and knowledge in designing and manufacturing the AVC valve. Therefore, there is no imminent threat of disclosure which must be enjoined. Furthermore, the damage, if any, Eaton may sustain prior to the final resolution of this lawsuit on the merits can be adequately compensated in damages. The Plaintiff alleges that damages cannot be calculated because of the interrelationship between price, production and competition and further that even if the amount of damages could be ascertained, the Defendants do not possess the resources to pay a damage award. The Court finds that there is no evidence in the record to support these allegations.

9. In considering the balance of equities between the parties, the Court may issue a preliminary injunction only where "the balance tips decidedly in favor of plaintiffs." *Heldman v. United States Lawn Tennis Assn.*, 354 F.Supp. 1241, 1250 (S.C.N.Y. 1973). In the case before the Court, the equities tip decidedly in favor of the defendants.

Krzewina and Donahue have agreed not to use or disclose secrets of Eaton and to

date they have not done so. Plaintiff has failed to demonstrate that Defendants intended to violate their agreements. Eaton seeks an injunction that would prevent all competition by Krzewina and Donahue. Such a termination of operations would cost Krzewina, Donahue and AVC at least $45,-000.00 per week. Such an expense is likely to destroy defendants financially before they have had an opportunity to vindicate their business operations at a trial on the merits.

In contrast, Eaton is a major corporation with assets and annual sales measured in many millions of dollars. It sells more than 50,000,000 valves annually. The damage Eaton may sustain during several weeks or months of competition by AVC will not result in total devastation of the Company as would likely occur to AVC of a wrongly issued injunction.

10. As noted by the Supreme Court of Indiana in *Donahue v. Permacel Tape Corp., supra,* any restrictions on an employee's liberty of action in his business or trade are not favored by the law. Indiana courts do not hesitate to strike down restrictive covenants against employees if they are the least bit overly broad. See, *Slisz v. Munzenreider Corp.,* Ind.App., 411 N.E.2d 700 (1980); *Frederick v. Professional Bldg. Main. Indus., Inc.,* 168 Ind.App. 647, 344 N.E.2d 299 (1976). Furthermore, where the underlying protectable interests of the employer appear minimal, courts are apt to even more closely scrutinize the terms of the restraint. See, *e. g., Captain & Co., Inc., v. Towne,* Ind.App., 404 N.E.2d 1159 (1980). The evidence in this clearly shows that, Eaton despite the labels affixed to the information sought to be protected, are minimal. The public interest in free competition between Eaton and AVC and freedom of job mobility clearly militate against imposing restrictions on Krzewina and Donahue which are not contained in their contracts of employment.

Based on the evidence, Eaton has failed to sustain its burden of proof to entitle it to the issuance of a preliminary injunction. Eaton has failed to show that it has a reasonable likelihood of establishing the existence of any trade secrets and any misappropriation thereof. Nor has Eaton presented conclusive evidence that it will suffer irreparable harm, that it does not have an adequate remedy at law nor that it is in the public interest to issue a preliminary injunction. Accordingly, Plaintiff's Motion for a Preliminary Injunction is hereby DENIED. SO ORDERED.