**INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Gary Norman RYAN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. J79–0583(R), J79–0594(R).**

United States District Court, S.D. Mississippi, Jackson Division.

April 11, 1984.

Charles R. Davis, Jackson, Miss., for plaintiffs.

George L. Phillips, U.S. Atty., Jackson, Miss., Barbara J. Ballin, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION

DAN M. RUSSELL, District Judge.

Plaintiffs bring this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) for damages occasioned by the crash of a Cessna 402A aircraft. The issues were submitted to the Court in a non-jury trial; after a hearing on the merits, the Court now makes its Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52.

## FINDINGS OF FACT

1. These actions arise from the crash of a Cessna 402A aircraft, registration number N 4559Q at approximately 10:24 p.m. Central Daylight Time in Madisonville, Kentucky, on October 27, 1977.

2. At the time of the crash, the aircraft was piloted by the plaintiff Gary Norman Ryan (Ryan) who was on an air transport flight from Jackson, Mississippi, en route to Detroit, Michigan.

3. This aircraft was insured by the Insurance Company of the State of Pennsylvania. The plaintiff Insurance Company of the State of Pennsylvania seeks to recover the amount it paid under an insurance policy to Miller Air Transporters, Inc., Ryan's employer, for the damage sustained to the aircraft in the crash.

4. As a result of the aforementioned crash, Ryan filed a claim for money damages with the Federal Aviation Administration (FAA) in the amount of $291,725.15. The Insurance Company of the State of Pennsylvania subsequently filed a claim for money damages with the FAA in the amount of $69,711.50. Both claims were denied in writing.

5. On October 27, 1977, Ryan, employed by Miller Air Transporters as a commercial pilot, was to carry cargo for his employer with his intended route of flight being to

depart from Jackson, Mississippi, to make a stop in Tupelo, Mississippi, to deliver some freight, then to make a stop in Evansville, Indiana, to refuel, and to resume flight to his final destination of Detroit, Michigan.

6. Approximately one hour before his flight was to begin, Ryan went to the Flight Service Station (FSS) at Thompson Field in Jackson where he obtained a weather briefing. As part of this briefing, Ryan was told that the present conditions at Evansville were clear skies and four miles visibility. At the time of this briefing the forecasted weather in Evansville at 9:00 p.m., Ryan's expected arrival time, called for visibility of three miles and haze and the ceiling to be 1500 feet with scattered clouds. This forecast was good until two hours after Ryan's estimated time of arrival, 11:00 p.m. However, beyond the two hour period of arrival, conditions called for a partial obscuration and two miles visibility and fog with a chance of one mile visibility and fog.

Based upon the 11:00 p.m. forecast, Ryan knew there was a chance of fog forming at the Evansville airport and decided to file an IFR [1] flight plan.

7. Ryan departed Jackson en route to Detroit via Tupelo and Evansville at 5:59 p.m. He flew from Jackson to Tupelo under VFR [2] conditions.

8. At 6:18 p.m. while in the air enroute to Tupelo, Ryan filed an IFR flight plan for the portion of his flight from Tupelo to Evansville. At the time Ryan filed his flight plan he was required to check the weather; however, he admitted that he made no such weather check.

9. Ryan reached Tupelo at 7:05 p.m. and departed at 7:20 p.m. At approximately 7:26 p.m., Ryan contacted the Memphis Air Route Traffic Control Center [3] (Memphis Center) and activated his IFR flight plan.

10. At 8:25 p.m. the Memphis Center informed Ryan that weather conditions at the Evansville airport were down to one-eighth of a mile visibility and that a DC–9 had just missed an approach due to ground fog and haze. Conditions were not expected to improve until the following day.

One-eighth mile visibility means that on the ground a person could see one-eighth of a mile in front of himself. The fact that a DC–9 missed an approach means that the DC–9 was unable to land.

---

**1.** There are two types of aircraft flight:

Flight under visual flight rules (VFR) and flight under instrument flight rules (IFR). Simply stated, VFR flight is "fair weather flying" because, with certain exceptions not relevant to this case, to undertake a VFR flight the cloud "ceiling" or the bottoms of the clouds, must be at or above 1,000 feet above the ground, and visibility must be three miles or greater. 14 C.F.R. § 91.105.

Under VFR weather conditions, a pilot of an aircraft flies from one place to another by looking out the windows of his aircraft and using his eyes and any radio navigational aids he has onboard to determine his position over the ground. The pilot is not required to follow any specific route of flight or to file a flight plan. The pilot is not required to maintain radio communications with air traffic control facilities when flying VFR, except in certain high-density terminal areas not pertinent in this case.

When flying VFR a pilot avoids other aircraft in much the same manner as an automobile driver does; he looks out his windows, searches for other airplanes, and maneuvers his aircraft as necessary to avoid other aircraft. This method of flying is referred to as the "see and avoid" method.

The other type of aircraft flight, namely IFR flight, must be used when weather conditions preclude flight under VFR. When the weather conditions do not meet VFR minima, described previously, the pilot must fly, if at all, under instrument flight rules (IFR). In order to operate under IFR, a pilot must receive training and pass written and flight examinations. 14 C.F.R. § 61.65. Further, in order to fly IFR, an airplane must be equipped with certain basic instrumentation. This is because when flying IFR the pilot's visibility is hampered by the weather and a pilot must rely on his instruments to keep his aircraft flying in the proper direction and at the desired altitude and airspeed. When flying in IFR conditions, the pilot navigates by reference to radio navigational equipment and must maintain radio contact with the air traffic control system. 14 C.F.R. § 91.125.

**2.** See note 1 supra.

**3.** The Memphis Center is one of twenty air route traffic control centers (ARTCC). ARTCCs generally provide radar coverage and guidance to aircraft at high altitudes while they are en route from point to point under instrument flight rules.

11. A certain visibility minimum is required for a pilot to land at any airport which depends upon the type of approach the aircraft plans to "shoot."

Ryan admitted that the lowest permissible visibility for any landing at Evansville would be one-half mile visibility which is the minimum visibility required to shoot an instrument landing system (ILS)[4] approach.

12. Ryan as a commercial pilot was governed in the operation of his aircraft by the Federal Aviation Regulations, Part 91 and Part 135. These regulations prohibited him from beginning an approach into Evansville airport with conditions as they were.

13. At approximately 8:27 p.m., Ryan asked the Memphis Center air traffic controller with whom he was speaking the weather conditions at Owensboro, Kentucky. The reply was that the Owensboro weather was "wax off", the worst visibility a pilot can encounter. Owensboro is approximately 70 miles from Evansville.

14. Ryan then requested a frequency change[5] to contact the FSS at Paducah, Kentucky, for an updated weather briefing. This updated information indicated to Ryan that the fog conditions were local conditions limited to Owensboro and Evansville.

15. Ryan decided to continue to Evansville because conditions to the north were clear as far as he could see, no fog was in sight and he could see airports to the north of his position. Moreover, Ryan was accustomed to flying in areas of patchy ground fog along the Mississippi River, and the information he had received from Paducah FSS indicated that fog conditions were limited to Evansville and Owensboro.

16. Ryan then resumed communications with the Memphis Center. At 8:34:52 p.m. Memphis Center informed Ryan that visibility at Evansville was still one-eighth of a mile. At 8:38 p.m. the Memphis Center advised Ryan that visibility was down to one-sixteenth of a mile.

17. As Ryan neared the Evansville airport, Memphis Center transferred him to the direct control of Evansville Approach Control. At 8:40 p.m. Ryan was informed that visibility at Evansville was one-sixteenth of a mile and fog. At 8:42 p.m. Ryan was informed that several aircraft had executed missed approaches at Evansville.

18. At 8:47 p.m. Ryan got permission to make a frequency change to obtain updated weather information from the Terre Haute FSS. Ryan spoke with James Freeman, deputy chief of the FSS. Mr. Freeman failed to give Ryan an amended AIRMET Alpha One.[6] This AIRMET had been disseminated to flight service stations at 8:35 p.m. and warned of deteriorating weather conditions in the area where Ryan was heading. The AIRMET contained weather data that would have alerted Ryan that reported conditions at Owensboro and Evansville were not isolated and that such conditions would not be improving as stated in AIRMET Alpha One.

19. At 8:49 p.m., while still flying in clear weather conditions, Ryan determined to proceed to Evansville and view the weather conditions there. Ryan's decision was based on several factors: he had observed several clear airports during the preceding twenty minutes; at Henderson, Kentucky, twelve miles south of Evansville, Ryan observed clear conditions; and Ryan thought that any ground fog which

---

**4.** The ILS is a system of radio navigational aids designed to provide an approach path for exact alignment and descent of an aircraft on final approach to a runway. *See* Airmen's Information Manual, p. 1–4. This Manual is an FAA publication providing information to pilots and providing good operating procedures for pilots to follow.

**5.** Under an IFR flight plan, a pilot is required to advise an air route traffic control center such as

the Memphis Center prior to departure from their frequency.

**6.** An AIRMET is the acronym for Airmen's Meteorological Information. It is an in-flight weather advisory which can cover a variety of weather phenomena which are of operational concern to aircraft and potentially hazardous to aircraft having limited capabilities because of either equipment, instrumentation, or pilot qualifications.

he encountered would be limited to the Evansville area.

20. At 9:02 p.m. Evansville Approach Control cleared Ryan to land at the Evansville Airport. Ryan was forced to execute a missed approach.[7]

21. At approximately 9:10 p.m. Ryan announced that he had missed the approach and asked to be "vectored[8] around for another approach." At 9:18 p.m. Ryan was cleared for a second approach and at 9:22 p.m. Ryan informed Evansville approach control that he had executed a second missed approach due to fog.

At the time Ryan executed his second missed approach, he had less than one hour of fuel in one of his tanks and one hour and a few minutes in the other.[9] Air traffic control was given no indication that he was low on fuel.

22. Ryan was instructed to proceed directly to the Evansville VOR[10] which took approximately three minutes. At the VOR, Ryan asked for vectors to the Henderson airport, 8.2 nautical miles south of the Evansville VOR. He requested permission to make a contact approach[11] to Henderson and to call the Henderson unicom operator.

Three minutes after receiving clearance for contact approach, Ryan informed Evansville Approach Control that he had forty minutes of fuel remaining.

23. Ryan contacted the unicom operator at Henderson, Mrs. Jo Davis, at 9:30 p.m. informing her that he had less than forty minutes of fuel remaining on board. Ryan was told that visibility at the Henderson Airport was zero-zero.

24. At 9:32 p.m. Ryan re-established contact with Approach Control and informed Approach Control of his fuel situation—approximately forty minutes of fuel remaining on board and requested a frequency change to get more weather information from the Terre Haute FSS. Ryan was instructed to proceed directly to the Evansville VOR and hold on a 360 radial.

25. At 9:34 p.m. Ryan made contact with the Terre Haute FSS and spoke with James Freeman, deputy chief of the FSS. Ryan testified that he informed Freeman of his fuel situation, told him of his need to find an airport at which to land, and advised Freeman of his location. Freeman gave Ryan a weather report encompassing a large area and instructed him to fly to Bowling Green, Kentucky, where visibility was seven miles. Freeman further instructed Ryan that Bowling Green was between eighty and ninety nautical miles away.

Freeman testified that Ryan told him that he had fifty minutes of fuel remaining on board whereas Ryan testified that he told Freeman forty minutes of fuel. The fifty minute figure is indicated on the inflight contact strip;[12] however, Mrs. Jo Davis who overheard the Ryan/Freeman conversation testified that Ryan informed Freeman that he had only forty minutes of fuel remaining.

The Ryan/Freeman conversation lasted three to four minutes with Ryan returning to the air traffic control frequency at 9:37:49 p.m. During this conversation,

---

7. A missed approach is an approach to land that is begun but not completed, in this case due to weather.

8. Vectors are directional headings.

9. Fuel is drawn from both tanks simultaneously and Ryan's fuel situation was such that he had slightly more than one hour total fuel remaining.

10. A VOR is an acronym for very high frequency omni-directional range station. It is a signal to which pilots can tune in and use for directional guidance.

11. A contact approach is an approach where the aircraft, operating clear of the clouds with at least one mile flight visibility, may deviate from the instrument approach procedure and proceed to the airport of destination by visual reference to the surface.

12. The in-flight contact strip is a document routinely made by the FSS which contains various information about the aircraft and the discussion between the aircraft and the FSS.

Ryan was in a holding pattern at the Evansville VOR.

Testimony and documentary evidence revealed that on the same weather report was information that the Paducah, Kentucky, airport was clear with better current and forecasted weather conditions than those at Bowling Green. The Paducah airport was twenty nautical miles closer to Ryan than was the Bowling Green airport.

25. After talking with Freeman, Ryan returned to the air traffic control frequency at 9:37:49 p.m., spoke with Evansville Approach Control, requested an IFR clearance to Bowling Green, and began proceeding toward Bowling Green.

26. Unbeknownst to Ryan, Jo Davis had overheard Ryan's side of the conversation with Freeman. When she began listening to the conversation, she wrote down the time as being 9:35 p.m. and the number of Ryan's aircraft on a slip of paper. Mrs. Davis heard Ryan tell Freeman that he had only forty minutes of fuel remaining and needed a place to land.

As soon as Ryan's conversation with Freeman ended at 9:37 p.m., Jo Davis looked out her window at the Henderson airport and observed that the fog on the runway had cleared, that she could see all of the runway lights, the rotating beacon, and stars.

27. Immediately, Mrs. Davis contacted James Freeman at the Terre Haute FSS. She told Freeman of her knowledge of Ryan's predicament and that she wanted Freeman to inform Ryan that the Henderson airport was clear. Freeman responded that he had taken care of the matter by directing Ryan to Bowling Green. Mrs. Davis was persistent and insisted that Freeman relay this information to Ryan.

Mr. Freeman testified that Mrs. Davis did not contact him until approximately ten minutes after he ended his conversation with Ryan—at approximately 9:48 p.m.

Freeman testified that he did not want to relay this information because he believed conditions at Henderson would deteriorate shortly and that Ryan's aircraft was already on a safe course. To satisfy Mrs. Davis' insistence, he broadcasted the information over the last frequency on which Ryan had contacted him and additionally broadcasted it "blind" over two other radio frequencies at 9:48 p.m.

28. Ryan never received this information. Testimony for the plaintiff indicated that the proper procedure for relaying information to Ryan since he was flying IFR was to contact Indianapolis Air Traffic Control Center or Evansville Approach Control. Instead, Freeman made a broadcast over the FSS and VOR frequencies. Ryan's testimony indicates that had Freeman followed the correct procedures, Ryan would have had this information by 9:41 p.m.

29. Given Ryan's position and airspeed, he was less than two minutes away from Henderson Airport at 9:41 p.m. and by 9:43 p.m. he was in the vicinity of the airport traveling in a southeasterly direction toward Bowling Green.

30. After Freeman talked with Ryan and subsequently to Mrs. Davis, notes were made on the in-flight contact strip. Freeman wrote that Ryan had stated to him that he had fifty minutes of fuel on board. Freeman further wrote that Jo Davis had contacted him at 9:45 p.m. when, according to Mrs. Davis, he was contacted at 9:38 p.m. Additionally, Ryan claims that the in-flight contact strip was altered to indicate that Freeman made his FSS and VOR frequency broadcasts at 9:48 p.m. when, in fact, these broadcasts were made at 9:40 p.m.

Frank Hicks, an examiner of questioned documents, testified for Ryan that there was an alteration on the in-flight contact strip and that it appeared to him that the number "48" indicating 9:48 p.m. had been altered from "40" indicating 9:40 p.m. to "48". However, it was impossible for him to determine whether the original number was "48" or "40".

Edward Ball, an FBI special agent who examines questioned documents, testified on behalf of the United States that there

was evidence of overwriting on both the number "4" and the number "8" but that this could have been mere "doodling".

The Court finds that this in-flight contact strip was altered and that "40" was the original entry.

Given Ryan's location at 9:41 p.m. and at 9:43 p.m., see finding no. 30 *supra,* this alteration becomes crucial presuming that Ryan could have received the Henderson Airport information at 9:41 p.m. had Freeman followed the proper procedures for contacting a pilot flying IFR.

31. By 9:40 p.m. Ryan, without any information that the Henderson Airport was clear, received a clearance from Approach Control to fly to the Central City VOR and then fly directly to Bowling Green. The distance from Evansville to Central City VOR is twelve nautical miles.

Ryan testified that he made the decision to fly to Bowling Green via Central City VOR because he knew he had enough fuel to reach the Central City VOR and by so doing he would be close to two local airports; however, he was uncertain as to whether he had enough fuel to reach Bowling Green.

At 9:40 p.m. Ryan set his power setting at approximately sixty-five per cent.

32. Ryan testified that at 9:45 p.m. he was six miles southeast of Henderson airport; at 9:48 p.m. he was fourteen and one-half miles south of Henderson airport. By 9:55 p.m. Mrs. Davis testified that the weather at Henderson airport had deteriorated.

Ryan made calculations of how long it would have taken him to return to Henderson at various points along his route.[13] When Ryan was six miles southeast of Henderson, he determined that it would have taken him two to three minutes to return to Henderson. When he was fourteen and one-half miles southeast of Henderson, Ryan determined that it would take

him seven minutes to go back to Henderson.

The Court concludes that had Freeman properly relayed the weather information concerning the Henderson airport, Ryan could have landed his aircraft before the airport eventually closed in.

33. At 9:54 p.m. Ryan was transferred to Memphis Center and informed them that he could not reach Bowling Green and requested to be vectored to the nearest airport with a beacon. The Memphis air traffic controller gave Ryan vectors to the Muhlenburg, Kentucky, airport, five nautical miles away. Ryan did not declare an emergency.

At 9:54 p.m. Ryan decreased his power to approximately forty per cent. At 9:58 p.m. Ryan reported to Memphis Center that the Muhlenburg airport appeared to be closed in.

Ryan circled the Muhlenburg airport possibly three times but was unable to land due to fog.

34. At 10:09 p.m. Memphis Center instructed Ryan to fly to Sturgis airport which they informed him was twenty nautical miles away. At 10:13 p.m. Ryan was informed by Evansville Approach Center that Sturgis was forty nautical miles away. At 10:13 p.m. Ryan declared an emergency because his right engine was out of fuel.

35. By 10:14 p.m. Ryan estimated that he had five minutes of fuel remaining in his right engine and fifteen minutes of fuel remaining in his left engine. Approach Control gave Ryan headings toward the Madisonville, Kentucky, airport.

36. Ryan reached Madisonville on one engine and attempted to land even though unable to see the runway due to fog. At 10:24 p.m. Ryan crash landed the aircraft in a field near the runway.

37. As a result of his crash, Ryan suffered the following financial damages:

(1) $3,750.00 loss of income; (2) $2,551.35 hospitalization costs; (3) $11,010.00 medical and dental expenses; and (4) $1,099.80

---

13. These calculations were based on a ground speed of 180 knots traveling with a tailwind south from Evansville and 170 knots traveling with a headwind north, back toward Henderson.

transportation expenses, including an air ambulance to transfer Ryan to Mississippi Baptist Regional Medical Center in Jackson, Mississippi.

38. As a result of Ryan's crash, he will incur future medical expenses of $32,500.00 for reconstructive surgery and for future dental work.

39. Ryan suffered mental anguish prior to and during his crash that continued after the crash with his concerns of never realizing his goal of becoming a professional airline pilot. Ryan also sustained extensive physical injuries causing pain and suffering. Ryan has made a demand for the aforementioned damages in the amount of $240,814.

40. Also as a result of Ryan's crash the Plaintiff, Insurance Company of the State of Pennsylvania, suffered a loss totaling $69,711.50 for the loss of the aircraft.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) [14]

■ 2. Since this case is founded upon the FTCA, there can be no doubt that the place where the acts or omissions occurred determines which state's choice of law rules apply. *See Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Guillory v. United States,* 699 F.2d 781, 784 (5th Cir.1983). Because the plaintiffs allege that the acts or omissions causing Ryan's crash were those of Mr. James Freeman and occurred while Freeman was working at the Terre Haute, Indiana, FSS, the choice of law rules of the state of Indiana would apply.

■ 3. The Court finds that Indiana courts follow the *lex loci delicti,* the place of the tort, choice of law rule. *See Sharp v. Egler,* 658 F.2d 480, 483–84 (7th Cir. 1981) (noting the unsettled nature of this issue); *Eaton Corp. v. Appliance Valves Corp.,* 526 F.Supp. 1172, 1177–78 (N.D.Ind. 1981) (acknowledging the rule of *lex loci delicti*); *Maroon v. State Dept. of Mental Health,* 411 N.E.2d 404 (Ind.App.1980).

■ 4. Under the *lex loci delicti* rule, the substantive law of the place of the tortious injury governs the litigation. In the instant case, the crash occurred in Madisonville, Kentucky; thus, the tortious injury sustained by the plaintiffs occurred in Kentucky and that state's substantive law applies.[15]

■ 5. In Kentucky, actionable negligence consists of a duty, a breach of that duty, and resultant damage. *Raymer v. United States,* 455 F.Supp. 165 (W.D.Ky. 1978); *Illinois Central Railroad v. Vincent,* 412 S.W.2d 874, 876 (Ky.1967).

■ 6. There is no doubt but that a duty existed on the part of the Terre Haute FSS to advise requesting pilots such as Ryan of weather conditions accurately and completely. *Pierce v. United States,* 679 F.2d 617, 621 (6th Cir.1982); *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 233–36 (2d Cir.1967); *Himmler v. United States,* 474 F.Supp. 914 (E.D.Pa.1979); Federal Aviation Administration, *Flight Services Handbook,* p. 1.

7. The Court concludes that the failure of Mr. James Freeman to contact Ryan via Evansville Approach Control or Indianapolis Center to relay the information received

---

**14.** 28 U.S.C. § 1346(b) (1976) provides that:

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**15.** The general rule is that "where the issue is the choice between the law of the place where an allegedly wrongful act or omission took place and the law of the place where the injury ... was sustained, it is ... held that the place of the tort is the place where the injury ... was sustained." 16 Am.Jur.2d *Conflict of Laws* § 100 (1979).

from Jo Davis regarding the Henderson airport was a breach of duty owed to Ryan.

Robert D. Rudich, plaintiffs' air traffic control expert, testified that said information should have been passed on to the aircraft. This opinion was based upon the Flight Services Manual which required Mr. Freeman to give an aircraft in distress maximum assistance.

Freeman was aware that Ryan was under the direct control of either an air traffic control center or Evansville Approach Control, since Freeman knew that Ryan was flying under IFR. In this situation, the routine procedure for relaying information to Ryan was to contact Indianapolis ATCC or Evansville Approach Control. Ryan had no reason to be listening to the FSS or VOR frequencies.

8. The Court concludes that the failure of Freeman to furnish Ryan with Amended AIRMET Alpha One was a breach of duty. While Freeman gave Ryan a weather briefing at 8:47 p.m., he neglected to read the amended AIRMET which warned of deteriorating weather conditions in the area where Ryan was heading. This AIRMET would have warned Ryan that the conditions reported at Evansville and Owensboro were not isolated conditions which would be improving as stated in AIRMET Alpha One.

9. The Court concludes that Freeman's failure to indicate Paducah, Kentucky, as an appropriate landing location was also a breach of duty.

10. The fact that Mr. Freeman breached duties owed to Ryan is inconsequential unless those breaches were the proximate cause of Ryan's resulting damages. The Court concludes that Freeman's failure to indicate Paducah as an available landing location and Freeman's failure to relay Mrs. Jo Davis' weather information concerning the Henderson airport were the proximate causes of Mr. Ryan's crash.

At 9:34 p.m. when Ryan contacted the Terre Haute FSS and spoke with James Freeman, Ryan told Freeman that he had only forty minutes of fuel remaining and was in need of a place to land. After reading a teletyped weather report to Ryan, Freeman instructed Ryan to fly to Bowling Green, eighty to ninety nautical miles away. Freeman obviously stopped reading this teletyped report at the point where the report indicated the first clear airport. However, on the same report was information that the Paducah, Kentucky, airport was twenty nautical miles closer to Ryan than Bowling Green and was clear with visibility at seven miles. Ryan's testimony reveals that had he known about the weather conditions he would have flown there and his eventual crash would have been averted. Additionally, Richard Taylor, the government's expert pilot, admitted that a prudent pilot would have considered the option of going to Paducah. Bobby Norris, a government expert witness and FAA employee, admitted that Freeman should have told Ryan about Paducah and that Paducah represented a possible alternative action that Ryan could have taken. One of Plaintiffs' witnesses, Harold Plunkett, a former co-worker of Freeman's at the Terre Haute FSS, testified that it was customary at the FSS to give pilots information concerning all available airports where they could land. Another plaintiffs' witness, Robert Rudich, an expert in FSS procedures, testified that Freeman had a duty to tell Ryan about Paducah. Based on the foregoing testimony, government regulations and case law, it was Freeman's duty to give Ryan complete and accurate weather information, including information he needed in order to make an informed decision as to where he wanted to go; it was not Freeman's place to make that decision for Ryan.

The credible evidence in this case leads the Court to the conclusion that Jo Davis called Freeman with information concerning weather conditions at the Henderson airport at 9:37 p.m. or 9:38 p.m. The Court is convinced of this fact because FAA transcripts show that Ryan had concluded his conversation with Freeman and returned to the Approach Control frequency at 9:37 p.m. The in-flight service contact log at the Terre Haute FSS originally noted, although later altered, that Freeman's attempted broadcasts on the FSS and VOR frequencies occurring after his conversa-

444

tion with Jo Davis were made at 9:40 p.m. According to Ryan's own calculations, when he was fourteen and one-half miles southeast of Henderson at 9:48 p.m., it would have taken him seven minutes to go back to Henderson. If the information had been conveyed to him at 9:40 p.m. or at any time before 9:48 p.m., Ryan could have returned to Henderson well before the weather there deteriorated at 9:55 p.m. and the crash would have been averted. Thus, the Court's finding of proximate cause.

11. The third element, resultant damage, is not contested.

■ 12. In Kentucky, contributory negligence bars recovery. *Melton v. O.F. Shearer & Sons, Inc.*, 436 F.2d 22 (6th Cir.1970); *Baird v. Cincinnati, New Orleans, & Texas Pacific Railway Co.*, 315 F.2d 717 (6th Cir.1963); *Williams v. Chilton*, 427 S.W.2d 586, 591 (Ky.1968).

The Court concludes that Ryan was contributorily negligent in the following respects: (1) by failing to follow the Federal Aviation Regulations including FAR 135.-111(a) which provides that no pilot may begin an instrument approach where airport weather conditions are below IFR landing minimums—Ryan's violation when he attempted to land at Evansville wasted perhaps fifty minutes of fuel; (2) by continuing on his course to Evansville when told of the Evansville weather; (3) by violating FAR 91.5 in failing to list an alternate airport in his IFR flight plan and by not checking the weather for the segment of his flight beginning in Tupelo; (4) by failing to have onboard the approach plates for the Muhlenburg airport in violation of FAR 135.71; and (5) by failing to further reduce his power setting when he began his trip to Bowling Green.

13. Ordinarily, this would bar Ryan's recovery; however, Kentucky jurisprudence recognizes the doctrine of last clear chance.[16] In *McFall v. Tooke*, 308 F.2d 617, 623 (6th Cir.1962), it is stated:

that a plaintiff in peril through his own negligence may recover for harm caused

by defendant's subsequent negligence if, a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and b) the defendant ... would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise ....

*Id.* The Court further commented that the foregoing is applicable only when a plaintiff is in "a position of peril from which he cannot, at the time of the accident, extricate himself." *Id.* (italics omitted); *General Telephone Co. v. Yount*, 482 S.W.2d 567 (Ky.1972).

14. The Court concludes that the last clear chance doctrine is applicable on the present state of the record. This is a classic example of a plaintiff in a position of peril from which he could not physically extricate himself, i.e., a helpless position of peril. Ryan was in a position of peril after his inability to land at Henderson and after resuming his flight in an area completely covered by ground fog with only 40 minutes of fuel on board. Ryan could not extricate himself from his perilous situation, since he had no way of resolving his predicament through his own actions. Ryan's conversation with Freeman at 9:34 p.m. and Mrs. Davis' conversation with Freeman at 9:38 p.m., as well as Freeman's own admission that he knew of Ryan's limited choice of landing sites due to widespread ground fog is evidence that James Freeman knew of Ryan's perilous position. It is undisputed that Freeman was the only person who got information about Paducah and Henderson and, at the same time, could have relayed the information to Ryan. Therefore, the government, i.e., Freeman, had the last clear chance to avoid injury to Ryan, and he failed to do so by performing his duty as required by law.

Based upon the foregoing reasons, the government's defense of contributory negligence has no force or effect.

**16.** The doctrine adopted by Kentucky courts is patterned after §§ 479, 480 of the Restatement

of the Law of Torts, Second.

15. Based upon the foregoing, the Court holds that Ryan is entitled to damages in the amount of $291,725.15,[17] and Insurance Company of the State of Pennsylvania is entitled to damages in the amount of $69,711.50.

An order in accordance with the opinion of this Court shall be submitted as provided for in the Local Rules.

---

**17.** For an enumeration of Ryan's damages, see findings of fact no. 37–39 *supra.*