**Joy ABRISCH, et al., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Sherrie Lynn Weidner, et al., Plaintiffs,**

v.

**United States of America, Defendant.**

**George Thomas Bowden,
et al., Plaintiffs,**

v.

**United States of America, Defendant.**

**Nos. 3:02–CV–1085–J–32MCR, 3:02–CV–1114–J–32MCR, 3:03–CV–39–J–32MCR.**

United States District Court,
M.D. Florida.
Jacksonville Division.

Nov. 15, 2004.

---

Stephen J. Pajcic, Thomas Fitzpatrick Slater, Pajcic & Pajcic, P.A., Barry Edward Newman, Edward M. Booth, Jr., Spohrer, Wilner, Maxwell & Matthews, P.A., Adrian Gentry Soud, Jeffrey D. Soud, Soud Law Firm, Jacksonville, FL, for Plaintiffs.

Colleen L. Conlin, Stephen Dunn, Office of the Chief Counsel, Federal Aviation Administration, Jessica M. Prosser, U.S. Department of Justice, Washington, DC, Marcio W. Valladares, Bonnie Ames Glo-

ber, U.S. Attorney's Office Middle District of Florida, Jacksonville, FL, Paul I. Perez, U.S. Attorney's Office Middle District of Florida, Orlando, FL, for Defendants.

James B. Chaplin, Mediation, Inc., Ft. Lauderdale, FL, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CORRIGAN, District Judge.

On the evening of December 12, 2001, flight N7701J, a Piper Cherokee single-engine aircraft, crashed about one mile from Runway 7 at Jacksonville International Airport ("JIA"), killing the pilot, Donald W. Weidner, and his three passengers, George Thomas Bowden, and Adrienne and James Abrisch. Their next of kin and/or estate representatives each filed suit against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671, claiming the Federal Aviation Administration ("FAA"), as an agent of the United States, breached its duty of care in providing air traffic control services to pilot Weidner, which negligence caused or contributed to the crash of the airplane. These suits were consolidated[1] and tried for seven days in September and October of 2004 before the Court sitting without a jury.[2] Following the submission of proposed findings of fact and conclusions of law by both sides, the Court heard closing arguments and, after careful consideration of the voluminous record and relevant law, these cases are now ready for decision.

All parties agree that the crash occurred because the pilot became spatially disoriented, causing him to lose the ability to control his airplane. I conclude that the plaintiffs have proven by a preponderance of the evidence that FAA air traffic controllers failed to give pilot Weidner the current weather information on that night which would have alerted him that weather conditions were rapidly deteriorating and that this failure contributed to the pilot's spatial disorientation. However, I further find that pilot Weidner himself also contributed to creating his spatial disorientation by forgoing the other options available to him and attempting instead to make his third instrument approach landing of the flight (after two missed approaches) when he was fatigued, ill, and on medication. Applying Florida comparative negligence principles, I hold that the FAA's negligence was the legal cause of 65% of the accident and that pilot Weidner's negligence was the legal cause of 35% of the accident. My full reasoning follows.

## I. Findings of Fact[3]

### A. Background

On December 12, 2001, Donald W. Weidner, who was an attorney and a pilot, left his Jacksonville home at approximately 6:00 a.m.[4] and drove to St. Augustine where he met his clients, Adrienne and James Abrisch. With Weidner piloting his single-engine plane, the three of them flew

1. As directed by the Court upon consolidation of these cases in April 2003, all filings have been docketed in the *Abrisch* case only, Case No. 3:02–cv–1085–J–32MCR.

2. The bench trial was interrupted midway due to Hurricane Ivan.

3. To prove their case at trial, plaintiffs had to show by a preponderance of the evidence that the air traffic controllers' negligence was a proximate cause of the crash of flight N7701J.

Under this standard, where the evidence to support a relevant finding was in dispute, I have weighed the evidence on both sides to determine what facts "are more likely true than not true." Eleventh Circuit Pattern Jury Instructions (Civil Cases) 1999, Basic Instruction 6.1.

4. Times stated are in Eastern Standard Time, given in hours, minutes and (where relevant) seconds.

from St. Augustine to Fort Lauderdale to attend the deposition of Adrienne Abrisch, which began at 10:15 a.m. George Thomas Bowden, who practiced law with Mr. Weidner, met them in Fort Lauderdale and, following the deposition, which lasted until approximately 3:30 p.m., the four of them departed Fort Lauderdale, planning to fly first to St. Augustine to drop off the Abrisches and then to Craig Airport in Jacksonville.

Before departing from Fort Lauderdale, Weidner contacted an automated flight service to obtain the current weather conditions at St. Augustine and Craig. In the recording of that conversation, Weidner is heard deeply coughing and the preponderance of the evidence established that Weidner had ingested acetaminophen and pseudoephedrine, likely to relieve symptoms of a cold or upper respiratory infection.[5] During this call, Weidner learned that an Airman's Meteorological Information (AIRMET) bulletin was in effect for Northeast Florida due to diminished visibility and that fog and low visibility conditions covered much of coastal Florida from Daytona northward. Weidner, who had been flying for over 20 years but had just been certified by the FAA in February 2001 to fly using instruments, then filed Instrument Flight Rules ("IFR")[6] flight plans for both St. Augustine and Craig.[7]

The plane departed Fort Lauderdale Executive Airport at about 4:50 p.m. and at 6:09 p.m., while just south of Daytona Beach, Weidner contacted Miami Flight Watch to obtain a weather briefing for the conditions at his destination airports. Weidner reported to Miami Flight Watch that during his trip from Fort Lauderdale to his current location south of Daytona, he had enjoyed "smooth sailing all the way" with a "scattered layer below us ... periodically[,] but very smooth[,] a very nice flight." Joint Exhibit 2–B. Weidner's report is consistent with the testimony of the meteorology expert that Daytona was

---

**5.** *See* Defendant's Exhibits 28, 29 and 31 (medical examiner's report and toxicology reports); testimony of Dr. Michael Berry, Vol. VI at Tr. 280–92.

**6.** Unlike visual flight rules ("VFR") conditions in which pilots can fly by visual reference to the ground and horizon, under IFR conditions, pilots fly by reference to instruments in the aircraft. *Barbosa v. United States*, 811 F.2d 1444, 1445 n. 1 (11th Cir. 1987). "[It] is presumed [during IFR conditions] that pilots cannot see other aircraft or the ground and are guided by air traffic controllers." *Worthington v. United States*, 807 F.Supp. 1545, 1549 (S.D.Ga.1992), *rev'd on other grounds*, 21 F.3d 399 (11th Cir.1994). When making an approach to an airport under IFR conditions, as Weidner anticipated by filing IFR flight plans for both St. Augustine and Craig, pilots use "instrument approach procedures." These are official published charts giving detailed instructions for descending and finding the runway using radio navigation aids to follow an increasingly narrow path until actually landing. At a certain point along this path, known as decision height, the pilot must have certain visual references in sight to legally continue with his approach. If none of those references are seen at decision height, the pilot must abort the landing, executing a "missed approach," where he flies a specific path upward and away from the airport runway area. *See generally*, 14 C.F.R. § 91.175; testimony of radar flight track reconstruction expert Robert Cauble, Vol. II at Tr. 84–90, 108–09; and testimony of piloting techniques expert Lyle Schaefer, Vol. IV at Tr. 10–14, 20–21, 23–51.

**7.** As part of his instrument flying certification training, Weidner would have received warnings about the risk factors which can lead to spatial disorientation. *See* testimony of piloting techniques expert, Lyle Schaefer, Vol. IV at Tr. 21. As discussed in much greater detail below, spatial disorientation, a condition in which a pilot loses his sense of orientation, can be caused by one or more of the following risk factors: weather, turbulence, night, formation flying, aircraft maneuvers, VFR–IFR transition, head movement, anxiety, distraction, fatigue, illness, alcohol, instrument failure, inexperience, and medication.

experiencing VFR conditions at that time. *See* testimony of Dr. Lee Ray Hoxit, Vol. VI at Tr. 168. Miami Flight Watch informed Weidner that St. Augustine was reporting two miles of visibility[8] and 200 foot overcast[9] with mist and Craig was reporting 1/2 mile visibility and 100 foot overcast with fog. Although Weidner had not requested the Jacksonville International Airport weather, he was also advised that JIA was reporting 1½ mile visibility with broken clouds[10] at 200 feet and a 500 foot overcast in mist.

Due to weather, Weidner's attempt to land at St. Augustine was unsuccessful and he executed a missed approach. At 7:09 p.m., while en route to Craig Airport, the air traffic controller monitoring the Satellite Radar position[11] asked Weidner whether he would attempt to land at JIA if he were unable to land at Craig. Weidner said he would and, at 7:16:51, Weidner advised the Satellite Radar controller that he had missed the approach at Craig and would like to be directed to JIA.

## B. Air Traffic Control Operations at Jacksonville International Airport[12]

On the night of the crash, JIA's permanent air traffic control tower, which is approximately 190 feet high, was closed for a four day period for renovations. During the closure, the radar room was still in operation but the Local and Ground air traffic controllers (who control flights on final approach, on the ground, and during take-off) operated out of a temporary control tower, located at ground level on JIA property between the taxiways near the approach ends of Runways 7 and 13. Not all of the equipment used in the permanent tower was available in the temporary tower. A written procedures manual outlined the plan for compensating for the lack of certain equipment during use of the temporary tower. For purposes of this decision, there were three significant differences in the operation of the temporary tower as compared to the permanent tower.[13] *See generally,* testimony of Steven Stump, Vol, I at Tr.128–33; Michael Flanagan, Vol. I at Tr. 185–228, 250–56; Arnold Olinger, Vol. V at Tr. 281–84; Lawrence Haines, Vol. VI at Tr. 7–9, 17–18, 29; and Joint Exhibit 3 (Temporary Tower Operating/Briefing Guide).

First, under normal tower operations, weather data recorded by instruments at the airport and by the certified weather observer is updated on at least an hourly

---

**8.** Visibility "describes the sight distance a pilot would have in the sky just before landing or take-off." *Worthington,* 807 F.Supp. at 1551.

**9.** A measurement of overcast is the height at which a solid layer of clouds prevents anything higher from being seen. *See* testimony of certified weather observer James Yackey, Vol. I at Tr. 51.

**10.** A layer of "broken clouds" refers to a cloud layer which obscures between 5/8 and 7/8 of the sky. *See* testimony of meteorology expert Lee Ray Hoxit, Vol. VI at Tr. 171.

**11.** The Satellite Radar controller is responsible for the airspace at satellite airports in the Jacksonville area and he monitors that airspace from a position in the radar room at the base of the air traffic control tower at JIA (also called the TRACON).

**12.** In August 2004, the undersigned, accompanied by the parties' lawyers, toured the air traffic control facilities at JIA, visiting the permanent tower, the radar room, and the temporary tower (though the temporary tower was not operational during our visit nor was it in the same location as it was at the time of the crash). My understanding of air traffic control operations was enhanced by this visit.

**13.** In an order on pretrial motions, the Court ruled that the FAA's decision to operate a temporary tower as well as decisions regarding how to operate the temporary tower were protected under the discretionary function exception.

basis on an Automated Surface Observation System ("ASOS") machine. The controller in the tower can then supplement that information if warranted based on his own weather observations and he then enters that information into a machine called an IDS–4. IDS–4 monitors are available in the permanent tower and at every radar station in the windowless radar room and display the current weather at JIA and at other airports monitored by Jacksonville's radar operations. With each subsequent weather update to the IDS–4, a new sequential alphabetical code is assigned to the information, such as "*M*ike," "*N*ovember," "*O*scar," which permits air traffic controllers to refer to a weather sequence without recitation of the actual weather information contained therein. The temporary tower, however, did not have an ASOS machine or an IDS–4. Instead, weather information had to be relayed to the temporary tower controllers by Nextel walkie-talkie or by telephone from controllers in the radar room who would receive weather information from their IDS–4 monitors or from telephone calls from the on-duty certified weather observer. According to the temporary tower operating/briefing guide, the Data–1 controller in the radar room was given specific responsibility for passing current weather to the controllers in the temporary tower.

Second, while JIA's IDS–4 monitor updates and ATIS broadcasts [14] for pilots are usually handled by an air traffic controller in the permanent tower (who, again, has access to the weather information displayed on the ASOS monitor and can sup-plement that information by making his own observations from his location in the tower), during the temporary tower operations, a controller in the radar room was responsible for cutting the ATIS broadcasts and for updating the IDS–4 display. According to the temporary tower operating/briefing guide, the Data–1 position was responsible for updating the IDS–4 and for alerting the Radar Supervisor–In–Charge of the need for an ATIS update.

Third, in contrast to communications between pilots and air traffic controllers on all other air traffic control frequencies, the communications over air traffic control frequencies originating in the temporary tower were not recorded. Thus while the content of Weidner's communications with other air traffic controllers is a matter of stipulated fact based on the recordings, once the pilot was turned over to the Local controller for his final approach into JIA, no further recordings of any communications are available and the content of those communications is hotly disputed.

## C. Weidner's flight toward Jacksonville

At 7:17 p.m., after Weidner notified the Satellite Radar controller that he wanted to be directed to JIA following his missed approach at Craig, the Satellite Radar controller directed Weidner to change frequencies to listen to the Information Mike ATIS broadcast for JIA, and to then contact the JIA approach frequency. The Information Mike ATIS broadcast had been recorded at 6:18 p.m. to reflect the

14. An Automated Transcribed Information System (ATIS) broadcast is a continuous voice recording providing pilots with an airport's weather and other pertinent information. A new ATIS is recorded hourly or more frequently to reflect the updated weather displayed on the IDS–4. As each new ATIS broadcast is recorded, it is assigned the next sequential alphabetical code to match the al-phabetical code assigned to the weather sequence then current on the IDS–4. *See* Joint Exhibit 4 (Air Traffic Control Manual) at ¶ 2–2–9 and trial testimony of air traffic controllers. In rapidly changing conditions, the ATIS can direct pilots to contact air traffic controllers for an airport's current conditions. *See* Aeronautical Information Manual at ¶ 4–1–13(e).

weather as observed at JIA by a certified weather observer at 5:56 p.m., which included 1½ miles visibility in mist, ceiling[15] broken at 200 feet, with an overcast layer at 500 feet and altimeter setting of 30.17. The Information Mike weather was the same JIA weather Weidner had heard at 6:09 p.m. from Miami Flight Watch.

However, apparently unbeknownst to the Satellite Radar controller who directed Weidner to pick up Information Mike, new and worse weather had more recently been observed by the certified weather observer at 6:56 p.m., who reported that the visibility had dropped to 1¼ mile in mist, and the ceiling was now broken at 100 feet, with an overcast layer at 500 feet. Instead of entering that 6:56 p.m. ASOS observation into the IDS–4 or recording a new ATIS broadcast, however, upon an inquiry from the Local controller in the temporary tower, the Radar Supervisor–In–Charge called the certified weather observer at 7:12:28 to question whether the visibility might be even worse than the new 1¼ mile observation. There is no evidence that the Radar Supervisor–In–Charge ever communicated his knowledge about the worsening weather to any other controllers in the radar room, including the Satellite Radar controller. The certified weather observer agreed that the visibility was further diminishing and at 7:16:51, he transmitted a new special ASOS observation for JIA of 1/2 mile visibility in fog, broken ceiling at 100 feet, and an overcast layer at 500 feet.

The Data–1 controller in the radar room received the new ASOS and at 7:19:01, Data–1 relayed that weather information to the Ground controller in the temporary tower, advising Ground that the new 7:16:51 weather sequence would become Information November. The Data–1 controller then entered the new weather sequence into the IDS–4 system and gave the new weather to the Radar Supervisor In–Charge who recorded a new ATIS broadcast, Information November, which became available to pilots at 7:24 p.m. At 7:26:22, Data–1 called the Ground controller in the temporary tower to advise him that the ATIS had been updated with Information November.

Meanwhile, at 7:19:50, after having picked up Information Mike from the ATIS as directed by the Satellite Radar controller, pilot Weidner reported onto the JIA approach frequency monitored by the East Radar controller who was also located in the radar room at JIA. At 7:20:01, the East Radar controller asked Weidner whether he had Information Mike and Weidner reported that he did.[16] At 7:20:20 the East Radar controller instructed Weidner to switch to the North Radar frequency which instruction Weidner acknowledged on the East Radar frequency at 7:20:26.

Six seconds later, the North Radar controller made a blanket broadcast to alert pilots monitoring his frequency that updat-

---

**15.** "Ceiling" refers to the height of the lowest layer of clouds. *See* Parties' Joint Exhibit 11, 2001 AIM/FAR published by McGraw Hill at p. 314.

**16.** It is not clear whether the Information November weather sequence had been updated into the IDS–4 at 7:20:01 when the East Radar controller confirmed that Weidner had Information Mike. The National Transportation Safety Board ("NTSB") accident investigation report states that this new weather was updated in the IDS–4 at 7:17 p.m. but the

East Radar controller (Timothy Parks) credibly testified that if the IDS–4 monitor was reporting Information November, he would have reported that weather to pilot Weidner at 7:20:01, instead of confirming Information Mike. The government suggests that the IDS–4 was not updated until shortly before 7:20:32. *See* Doc. 112 (United States' Proposed Findings of Fact and Conclusions of Law) at ¶ 76. Decision in this case is not dependent on resolving the conflict in the evidence as to this point.

ed weather had been received. He then recited the details of the Information November weather sequence including that the visibility was 1/2 mile in fog, ceiling 100 foot broken, 500 foot overcast, altimeter of 30.20 and RVR[17] of 3500. The broadcast lasted approximately twelve seconds. During the next twenty to twenty-five seconds, the North Radar controller communicated with another pilot and there were short silences on the frequency. Then, at 7:21:08, pilot Weidner reported onto the North Radar frequency. The North Radar controller did not ask Weidner what weather information he had nor did he ask whether Weidner had heard the weather update the controller had recently announced.[18] For the next ten minutes, Weidner remained on the North frequency, following the controller's directions toward his final approach. During that time (and after the new 7:24 p.m. ATIS), two other pilots checked on and announced that they had Information Mike. The North Radar controller did not tell them that Mike was no longer current, although he did tell both those pilots that the RVR was 3500. The Information November weather sequence was never repeated after Weidner checked onto the North Radar frequency at 7:21:08.

At 7:30 p.m., the certified weather observer transmitted yet another weather update to reflect further deteriorating conditions. At 7:30:04 the Data–1 controller alerted the temporary tower Ground controller that 1/4 mile visibility with an indefinite ceiling of 100 feet had been observed. Data–1 did not advise other controllers in the radar room but that information became available to them shortly thereafter when it was posted on their IDS–4 monitors as Information Oscar.

At 7:31:26, without ever having confirmed the weather information Weidner had, the North Radar controller directed Weidner to turn to the tower frequency. At 7:31:31 Weidner acknowledged this direction and turned to the tower frequency then being monitored by the Local controller, William Lincoln, who would guide Weidner through the remainder of his flight.

### D. The final approach

Weidner reported onto Lincoln's frequency at approximately 7:31 p.m. and remained there until radar lost contact with his plane at approximately 7:41 p.m. As noted above, recordings of the communications between Lincoln and Weidner are not available. There is no dispute that while on the Local controller's frequency, Weidner announced that he was executing a missed approach and he later stated that his instruments were malfunctioning. The radar flight track reveals that N7701J descended to approximately 500 feet and then deviated from the intended flight

---

17. Runway Visual Range ("RVR") is "the measure of visibility in the touchdown zone area; it represents the horizontal distance a pilot will see down the runway from the approach end. It is electronically measured in terms of hundreds of feet, using standard calibrations, by instruments along the runway [which] are in update every 15 seconds." *Worthington*, 807 F.Supp. at 1550.

18. Two pilot experts opined as to what Weidner was doing between 7:20:26 when he acknowledged the East Radar controller's direction to switch to the North Radar and 7:21:08 when he reported onto the North Radar, a period of 42 seconds. The testimony revealed that while Weidner was perhaps monitoring the frequency before he reported on, he may also have been busy preparing for his approach which might have included finding and studying the approach plates for the appropriate runway, dialing in the navigation aid receiver, completing a pre-landing checklist, and perhaps rechecking the ATIS which, until 7:24 p.m., was still broadcasting Information Mike. *See* testimony of Lyle Schaefer, Vol. IV at Tr. 48–49; testimony of Kenneth Orloff, Vol. VII at Tr. 25–27.

path to Runway 7, crossing the flight path while continuing to descend to an altitude of approximately 300 feet,[19] as the pilot apparently attempted without success to regain the proper course. The radar flight track shows the plane then began a straight climb to about 600 feet followed by a climbing left turn to an elevation of approximately 1000 feet, at which point the aircraft entered a spiraling downward turn, crashing to the ground seconds later. *See* Radar Data Study (Plaintiffs' Joint Exhibit 63) at Plot 3.

Wayne Bittner, who was operating the Ground control position in the temporary tower testified as to what he recalled about the air traffic control operations that evening. Bittner testified that he received the incoming telephone calls from Data–1 about the weather and wrote the information on a pad of paper which he and the Local controller Lincoln passed back and forth between them.[20] Bittner also testified that he recalled that Lincoln may have been receiving separate phone calls to report RVR readings.[21] Vol. VI at Tr. 5–7.

Although Bittner recalled receiving the 7:19:01 weather sequence which would become Information November, he testified that he did not recall receiving the message at 7:26:22 to alert him that the ATIS had been updated with the Information November broadcast nor did he have any recollection of the 7:30:04 call advising him about the even newer weather observation, nor the call moments later advising him of the full new weather sequence which would become Information Oscar. *See* testimony of Wayne Bittner, Vol. VI at Tr. 42–55. Bittner was confident that, according to his standard operating procedures, he would have made notes about these calls on the pad he shared with Lincoln. Bittner further testified that he had no recollection of having overheard any of Lincoln's communications with planes on Lincoln's frequency.[22] *Id.* at Tr. 63–64.

Additionally, four pilots testified as to what they overheard while monitoring the Local control frequency in preparation for take-off or landing at or near the time that Weidner was on that frequency.[23] None of

---

**19.** The radar records elevation in 100 foot increments above mean sea level so a 300 feet mark on the radar flight track could actually indicate altitude as low as 250 or as high as 349 feet. *See* testimony of radar flight track reconstruction expert Robert Cauble, Vol. II at Tr. 87–89. Additionally, there is an acceptable margin of error of up to plus or minus 75 feet. *See* Aeronautical Information Manual, ¶ 7–2–3(a)(3), Cauble testimony, Vol. II at Tr. 88. Moreover, as noted on the following pages, Weidner's altimeter, which provides the pilot with altitude information, was apparently set to give a reading twenty to thirty feet lower than he was. Thus, Weidner either was or had reason to believe he was at or just above the 230 foot decision height for Runway 7 when he began climbing away from the runway environment.

**20.** Both Lincoln and Bittner were relieved from their posts just after the accident so that they could complete paperwork related to the accident. Neither of them knew what happened to the pad of paper and it was not kept

or secured as part of the crash investigation. This pad of paper would of course have been very relevant evidence and, like the failure of the FAA to record the transmissions between pilot Weidner and Local controller Lincoln, is an unfortunate omission in the record.

**21.** This is consistent with the testimony of other air traffic controllers. *See* testimony of Data–1 controller, Michael Flanagan, Vol. I at Tr. 203 (stating he did not have RVR information available at his location); William Lincoln, Vol. V at Tr.16–17 (stating he made calls to receive RVR); Lawrence Haines, Vol. VI at Tr. 10, 29 (stating he called temporary tower to report RVR values).

**22.** Bittner testified that he and Lincoln monitored different frequencies and were probably both wearing headsets. *See* testimony of Wayne Bittner, Vol. VI at Tr. 61–63.

**23.** The testimony of these pilots was offered by deposition. *See* Court Exhibits 1–4.

those pilots specifically recalled receiving weather information from the Local controller other than RVR and the two pilots who remembered overhearing Weidner on Lincoln's frequency could not recall hearing Lincoln give Weidner weather information. The pilot of one of the two single-engine flights that landed shortly before Weidner recalled that the Local controller did ask him to report his altitude upon seeing the runway environment. Those pilots who recalled any details of the weather they received that night recalled that the reported weather at the time was Information Mike.

The altimeter reading on Weidner's aircraft is some physical evidence which bears on the question of what weather information Weidner had been given at the time of the crash. To monitor the plane's altitude, a pilot sets a dial on his altimeter to match a barometric pressure reading announced by an air traffic facility. Each hundredth of an inch reflected on the altimeter's dial indicates approximately ten feet of altitude. *See* Aeronautical Information Manual, ¶ 7–2–3(b). A pilot's failure to correctly set his altimeter will affect his ability to properly follow approach procedures and land his aircraft. *Id.* at ¶ 7–2–3(d). On longer flights, pilots keep their altimeters adjusted to an airport's announced altimeter setting when within 100 miles of that airport and upon approaching an airport, pilots expect to hear regular altimeter readings from air traffic controllers. *See* testimony of Orloff, Vol. VII at Tr. 18–25. Altimeter settings are also included in ATIS broadcasts. *See* Aeronautical Information Manual, ¶ 4–1–13(b).

At the time Weidner was on his approach to Craig Airport, the proper altimeter setting for Craig was 30.19. The al-timeter setting for JIA near the time of Weidner's approach, as announced in both Information November and Information Oscar, was 30.20. The previous altimeter setting for JIA, as announced in Information Mike, was 30.17. The NTSB Factual Report states, "Examination of the altimeter showed the [sic] it had received impact damage and all three hands had come loose on the face. The barometric was 30.20 in. Hg, the approximate altimeter setting at the time of the accident." *See* Plaintiffs' Joint Exhibit 1 at Bates # NTSB0567. However, the Jacksonville Sheriff's Office took photographs at the scene of the crash and one of those photographs shows the aircraft's altimeter on the ground near other wreckage. In that picture, the altimeter setting appears to be set at 30.18 or 30.17.[24] The government's only evidence that the plane's altimeter was set at 30.20 is the NTSB statement quoted above. However, it is not clear whether this statement means that the *airport's* reported barometric reading was 30.20, which was the "approximate" setting of the plane's altimeter dial, or that the *plane's* altimeter dial was set at 30.20, which was the approximate altimeter reading at the airport. Based on the JSO picture, which even the government's own expert, Dr. Orloff, conceded showed a setting of 30.17 or 30.18,[25] I find that it is more likely than not that the altimeter's dial was set at 30.17 or 30.18 at the time of the crash (which is consistent with the proposition that pilot Weidner was still operating with Information Mike). Even without the JSO photograph (which was taken prior to the NTSB's arrival), there is enough ambiguity in the NTSB statement to discount it as "proof" that the

---

24. At trial, the government attempted to demonstrate that if the picture had been taken at an angle, the altimeter reading which appears

may be skewed. This demonstration was not persuasive.

25. *See* Orloff testimony, Vol. VII at Tr. 108.

plane's altimeter setting was 30.20, as the government contends.

Finally, there is the critical testimony of Mr. Lincoln, the Local controller. Again, in a departure from normal practice (apparently because the recording equipment in the temporary tower was inoperable), the FAA did not record the transmissions between Lincoln and Weidner that night. Because of the tragedy, none of the persons on board the plane can testify to these communications. Thus, we are left with the circumstantial and physical evidence described above and the testimony of Lincoln himself.

Lincoln provided personnel statements on December 12, 2001 (the night of the accident) and January 10, 2002 (*see* Plaintiffs' Joint Exhibit 22) and he was interviewed by the NTSB team investigating the crash on December 18, 2001. A summary of that interview is contained in the NTSB Group Chairman's report about the crash. *See* Plaintiffs' Joint Exhibit 1 at Bates # NTSB0575–0597. Lincoln also sat for a five hour deposition in this case in July of 2003 and provided a further decla-

ration on April 14, 2004 filed in support of the government's motion for summary judgment. *See* Court Exhibit 5 and Plaintiffs' Joint Exhibit 20.[26] Notwithstanding each of these opportunities, it was only at trial that Lincoln recalled having given Weidner full, timely and complete weather information including measurements for visibility, ceiling, wind, altimeter, temperature, dew point, RVR and PIREPS.[27] Upon questioning at trial, Lincoln testified that although he had reviewed some materials in advance of giving his earlier statements and deposition testimony, it was only when he heard tapes of conversations between the Ground controller and Data–1 shortly before testifying at trial that he recalled having given Weidner all of this information.

In addition to the inconsistencies between Lincoln's earlier statements and his trial testimony, Lincoln struggled even at trial to distinguish between what his usual practices were and what he actually recalled having done during a ten minute period one night nearly three years ago.[28] Overall, while the Court has no reason to

**26.** At his deposition in July 2003, Lincoln could not recall many of the specifics he was asked. However, at trial in October 2004 his recollection was much better and more detailed.

**27.** PIREPS, or pilot reports, are reports from other pilots communicated to air traffic controllers about the current conditions of visibility they are experiencing. *Worthington*, 807 F.Supp. at 1551. Two single-engine planes landed just before N7701J's attempt (one was seven minutes earlier, the other three minutes and 45 seconds earlier), both flights in which a student pilot and a flight instructor were on board. Reports from these pilots about the conditions they experienced upon final approach would be relevant information for Weidner.

**28.** For example, Lincoln testified that, his recollection having been refreshed, he knows that he issued Weidner the current quarter mile visibility and the indefinite ceiling of

100, yet three questions later he responds that once Weidner reported at the outer marker, Lincoln "issued any new PIREPS, if I had anything. Like if the second aircraft hadn't landed prior to him, I would have given that new PIREP information to him, the latest RVR. Again, the visibility, the wind. And I would have cleared him to land." *See* Vol. V at Tr. 22. Likewise, Lincoln testified that, in addition to the ceiling and visibility, "the rest of the sequence" would have been given to him. Upon questioning as to whether this was something Lincoln always did or something that he remembered doing that day, Lincoln testified, "I always do it. But also with the low weather, I would make sure pilots had all the most latest information." *Id.* at Tr. 81. This testimony leaves the Court with the impression that Lincoln knows what he usually does but, not surprisingly, cannot specifically recall what he did that evening.

doubt Mr. Lincoln's good faith, in light of the inconsistencies in his prior statements and testimony, his sudden recall at trial and the other contradictory circumstantial and physical evidence, I find it more likely than not that Mr. Lincoln did not give full, updated weather to Mr. Weidner while Weidner was on the Local control frequency.[29]

## II. Conclusions of Law

### A. Federal Tort Claims Act Liability

■ Under the Federal Tort Claims Act ("FTCA"), the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Under the FTCA, the law of the state where the alleged negligent act or omission occurred governs the rights and liabilities of the parties. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Here, all the alleged acts or omissions took place in Florida and the parties agree that the Court must apply Florida substantive law in resolving issues of liability and damages.

### B. Duty of care owed by Air Traffic Controllers

■ Applying Florida's traditional negligence principles, air traffic controllers owe pilots and their passengers the same duty of reasonable care that a reasonably careful person would use under like circumstances. *Daley v. United States*, 792 F.2d 1081, 1085 (11th Cir.1986). The

duties of air traffic controllers are set forth in the Air Traffic Control Manual (FAA Order 7710.65), and, although those guidelines are evidence of the standard of care in the industry, an air traffic controller's duties are supplemented by the general duty of care owed under the circumstances. *Id., Worthington*, 807 F.Supp. at 1566. Thus, once they undertake to provide a service, even one not required by the Air Traffic Control Manual, under general negligence principles, air traffic controllers have a duty to provide such services with due care. *Worthington*, 807 F.Supp. at 1567. *See also, Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1087 n. 5 (11th Cir.2004) (noting that, in contrast to the case before it in which OSHA employees' acts and omissions did not create liability for the plaintiff's injuries, "liability in air traffic controller cases stems from the public's reliance on such controllers").

■ In providing air traffic control services, air traffic controllers can presume that pilots know and will abide by the applicable Federal Aviation Regulations as well as information contained in the Air Traffic Control Manual and advisory circulars. *Id.* Among the duties assigned to pilots by law under the Federal Aviation Regulations is the final responsibility for the operation of an aircraft. 14 C.F.R. § 91.3(a). In carrying out this duty, a pilot "must be aware of those facts which are material to the proper operation of the aircraft and is charged with that which he should have known in the exercise of the highest degree of care." *Worthington*, 807 F.Supp. at 1567 (citations omitted).

29. Both parties advanced additional points that they believed were important to their position (such as, for example, plaintiffs' reliance on the statement attributed to Mr. Olinger in the NTSB Group Chairman's report). Although all the evidence and arguments have been considered, many of them are not discussed here simply because the Court either rejected them or reliance on those points was not necessary to decide this case.

Plaintiffs have advanced two theories of negligence in this case. First, plaintiffs claim that air traffic controllers breached their duty to provide the pilot of N7701J with accurate information about the current weather conditions at JIA. Second, plaintiffs claim that air traffic controllers failed in their duty to advise the pilot of the availability of alternate airports which the air traffic controllers knew were then reporting VFR conditions.

### 1. Claim regarding weather reports

■ Plaintiffs claim that air traffic controllers failed to provide Weidner with accurate, timely reports of the deteriorating weather conditions at JIA. Specifically, plaintiffs claim that Weidner had been advised that the visibility was 1½ miles in mist with a 200 foot broken/500 foot overcast ceiling when in fact, by the time Weidner was making his final approach, air traffic controllers knew that conditions had deteriorated to 1/4 mile visibility with an indefinite ceiling of 100 feet. Weather observations made immediately after the crash reported visibility of 1/8 mile with vertical visibility of 100 feet.[30] *See* Plaintiffs' Joint Exhibit 1 at Bates # NTSB0571. Information Mike suggested visibility substantially greater than what existed at the time of Weidner's final approach and a ceiling at least double that being observed. If controllers had trans-

mitted the correct information, it would have reflected weather that was rapidly deteriorating and was below Weidner's permissible landing minimums.

As set forth in the Air Traffic Control Manual, the first priority duty of an air traffic controller is the separation of aircraft. *Worthington*, 807 F.Supp. at 1550. Weather service is an additional service to be provided as a second priority performed as an air traffic controller's other duties permit. *Id.* at 1567. Nonetheless, in this case, none of the air traffic controllers testified that they were too busy separating aircraft to provide weather information to pilots. To the contrary, the traffic was deemed to be moderate or light and pilots and air traffic controllers alike recognized the severity of the weather that evening. *See e.g.*, Plaintiffs' Joint Exhibit 1 at Bates # NTSB0575–0597, (NTSB Group Chairman's report containing statements of air traffic controllers describing traffic volume); testimony of air traffic support manager, Arnold Olinger, Vol. V at Tr. 281–84 (explaining that the temporary tower operations were selected for those days because of traffic volume); testimony of Data–1 controller, Michael Flanagan, Vol. I at Tr. 257 (weather was changing rapidly); testimony of flight instructor Matthew Hiipakka, Court Exhibit 4 at Tr. 74 (weather could not have been more challenging); testimony of flight instructor

---

**30.** Plaintiffs do not dispute that Weidner was advised of the "RVR" conditions on Runway 7 which were reported to be 3500 feet, but claim that without the accompanying visibility and ceiling information, the RVR by itself was misleading because it created a false impression that conditions were better than they actually were. The RVR minimum for Weidner's flight was 1800 feet, so the reported RVR was nearly double the clearance he needed, yet the 100 foot ceiling was well below his decision height of 230 feet and the visibility at the Middle Marker (located 1/2 mile from Runway 7 where a pilot reaches decision height) was substantially less than

reported under Information Mike. Finally, there was testimony that RVR values were the most critical weather information needed by the two commercial jet pilots on Lincoln's frequency at the time Weidner was making his final approach (*see, e.g.,* Dr. Orloff trial testimony, Vol. VII at Tr. 92–93) and the evidence reveals that Lincoln was receiving RVR information separately from the rest of the weather sequence, all of which is consistent with plaintiffs' theory that Lincoln attentively provided RVR information but failed to provide the remainder of the weather sequence.

Buz Russell, Court Exhibit 3 at Tr. 53 (pilot was caught off guard by thickness of fog, which was thicker than any he had ever flown in).

The government acknowledges that, based on the facts of this case, it cannot reasonably claim that air traffic controllers had no duty to disseminate weather information. *See* Doc. 112 (United States' Proposed Findings of Fact and Conclusions of Law) at 55. Rather, the government contends that the weather information provided by its air traffic controllers was sufficient to apprise the pilot of the relevant conditions that he would encounter at JIA. *Id.*

In factually similar circumstances involving a pilot flying through foggy conditions to make an approach to Runway 7 at JIA, the Eleventh Circuit held that "[t]he controllers deprived [the pilot] of accurate information" when they failed to advise him of current weather conditions thereby causing him to become confused when he reached decision height, expecting to have visual references sufficient to land and instead being enshrouded in fog. *Worthington v. United States*, 21 F.3d 399, 403 (11th Cir.1994). Under the reasoning of *Worthington*, the Court finds that in the circumstances of this case, air traffic controllers did in fact have a duty to provide Weidner with timely, accurate weather on the evening of December 12, 2001.

■ At 6:09 p.m., Weidner was advised of weather conditions at JIA which were consistent with the weather sequence reported as Information Mike. At 6:56 p.m., the certified weather observer reported conditions which were worse than reflected by the Information Mike broadcast. Controllers with access to an ASOS monitor were advised of this new observation right away. Rather than advising other radar room controllers, who work in a windowless room and are therefore entirely dependent on others to tell them weather conditions, no one disseminated the actual 6:56 p.m. observation or advised the other controllers that a change in the currently reported weather sequence was forthcoming. Instead, following communications between the Radar Supervisor–In–Charge and the certified weather observer at 7:12:28, new weather readings were made and a new observation was transmitted over the ASOS at 7:16:51. While the Data–1 controller conveyed this information to the Ground controller in the temporary tower, when Weidner announced his intentions to fly to JIA, the Satellite Radar controller advised him at 7:17:05 that Information Mike was current. At 7:24 p.m., the new weather sequence (Information November) was updated onto the ATIS; it became available to all radar room controllers on their IDS–4 monitors sometime before that, no later than 7:20:32. Weidner communicated with air traffic controllers at 7:19:50, 7:20:01, 7:20:20, 7:20:26, 7:21:08, 7:31:26 and 7:31:31 and none of them advised him of this new weather. Additionally, at 7:25:21 and 7:25:42 air traffic controllers were still not advising other pilots on Weidner's frequency about the new weather when those pilots checked in having Information Mike.

At 7:30 p.m., the certified weather observer transmitted even newer and worse weather (which would become Information Oscar). Weidner was not provided with this new weather in his communications with air traffic controllers at 7:31:26 and 7:31:31. Finally, as previously discussed, even when on the Local controller's frequency, the preponderance of the evidence establishes that Weidner did not receive the current weather. Thus, like the pilot in *Worthington*, "[b]ased on the information at [Weidner's] disposal, [Weidner] thought he would break through the fog at decision height and have visual references sufficient to complete a landing." *Worthington*, 21 F.3d at 403. Instead, because

the controllers failed to give Weidner accurate weather information, Weidner unexpectedly failed to find any breaks in the clouds which would have allowed him to find visual references to the ground. Thus, air traffic controllers breached their duty of care by failing to provide Weidner with current weather information.[31] *See Worthington*, 21 F.3d at 407 (the pilot did not have "the best possible weather information" because "of a series of imprecise communications combined with an absence of communication" by air traffic controllers).

### 2. Claim regarding alternate airports

▆ Plaintiffs additionally claim that, given the unlikelihood that any aircraft would be able to land in the IFR conditions present at JIA, air traffic controllers had a duty to suggest alternate regional airports with better weather conditions, such as the nearby Gainesville Regional Airport, which was operating under VFR conditions on the evening of December 12, 2001. The government contends there is no support for this claim under the law. Plaintiffs cite to *Insurance Company of State of Pennsylvania v. United States*, 590 F.Supp. 435 (S.D.Miss.1984) as support. In that case, the pilot was low on fuel and, unable to land due to extreme weather at his destination airport, he spe-

cifically asked air traffic control about alternate airports at which he might attempt to land. *Insurance Company of State of Pennsylvania*, 590 F.Supp. at 439. Even though the air traffic controller had information about two very close airports operating with VFR conditions, he failed to provide this information to the pilot whose plane crashed when he ran out of fuel. *Id.* at 442–44. Here, by contrast, Weidner himself knew about the VFR conditions in Daytona, having recently flown by there. Moreover, there is no evidence that Weidner asked JIA controllers about alternate airports nor did Weidner give the controllers any reason to think he was "in trouble." Under these facts, the Court declines to find air traffic controllers breached any duty of reasonable care by their failure to suggest alternate airports.

### C. Causation

▆ Having proved that air traffic controllers acted negligently in failing to provide the pilot with current weather information, plaintiffs must additionally show by a preponderance of the evidence that such negligence was a legal cause of damage. Eleventh Circuit Pattern Jury Instructions (Civil Cases) State Claims Instructions 1.1 (1999). Negligence is a legal cause of damage if it directly and in natu-

---

**31.** As explained in more detail below, *infra* p. 1230, the evidence established to my satisfaction that the spatial disorientation caused by the weather began when Weidner was at an altitude of approximately 500 feet and, contrary to the government's position, I do not read the Eleventh Circuit's opinion in *Worthington* as strictly holding that weather is only a factor once a pilot is at his decision height. In fact, in holding that the air traffic controllers' failure to provide the correct weather created liability, the Eleventh Circuit in *Worthington* relied on *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2nd Cir.1967), in which the Second Circuit found liability for air traffic controllers' failure to provide the crew with information about a change in the

weather that brought conditions "dangerously close to landing minimums" because, although the crew had been circling the airport waiting to land and had been advised of "bad fog" and missed approaches by other aircraft, the crew's knowledge of the actual conditions may have led them to forgo a landing attempt at that airport or would at least have better prepared them for the likelihood of having to execute a missed approach. *Ingham*, 373 F.2d at 235. *See Worthington*, 21 F.3d at 407. Moreover, as noted above (*see supra* note 19), the evidence established that Weidner may indeed have reached or thought he reached decision height before he abandoned his runway approach.

ral and continuous sequence produces, or contributes substantially to producing such damage, so it can reasonably be said that, except for the negligence, the loss, injury or damage would not have occurred. *Id.* Negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such damage. *Id.* To prove causation under the facts of this case, plaintiffs must show that the air traffic controllers' failure to give the pilot Weidner timely and accurate weather was the legal and proximate cause of him becoming spatially disoriented.

According to the testimony of piloting techniques expert Lyle Schaefer, which the Court accepts for these purposes, operating on the mistaken assumption that Information Mike was current, Weidner would have reasonably begun to look for external reference points at an altitude of approximately 500 feet. *See* Vol. IV at Tr. 57–58. At that elevation, he could expect 1/8 to 3/8 of the cloud cover to be breaking, giving him obvious reference to the ground. As Weidner descended further to 300 feet or less, he likely continued searching for visual references outside which he could not see due to the deteriorating weather conditions that were known to air traffic controllers at the time. The medical and aeronautical experts agreed that

by repeatedly turning his focus from his instruments to the outside environment and back, Weidner likely began to experience spatial disorientation. Then, in what was either an effort to attempt to combat those symptoms, or because he had reached decision height without visualizing any required reference on the runway environment,[32] Weidner attempted to return his full attention to his instruments to execute a missed approach. Unfortunately, Weidner was unable to regain control of the aircraft and, as the parties have stipulated, N7701J crashed due to the pilot's becoming spatially disoriented.[33] I find that the air traffic controllers' failure to provide Weidner with the current weather conditions was a legal and proximate cause of his becoming spatially disoriented. *See Worthington,* 21 F.3d at 406 ("Spatial disorientation and the failure to successfully execute a missed approach are precisely the harm that this defendant should have expected after depriving Mr. Worthington of accurate and timely information about weather conditions when he approached a landing strip shrouded with fog.").

**D. Comparative Negligence**

 Under Florida's comparative negligence principles, I must determine whether the pilot's negligence also played a role in his becoming spatially disoriented and if so, to what extent. *Hoffman v. Jones,* 280 So.2d 431, 438 (Fla.1973) (announcing that under Florida law, where

---

**32.** As noted above, *supra* note 19, Weidner may have descended as low as decision height (230 feet).

**33.** There was testimony that had the pilot known that Information Oscar or November was the current weather, he may not have even attempted to land at JIA. However, the pilot's attempted landing at Craig occurred during similar weather conditions (1/2 mile visibility and 100 foot ceiling). Nonetheless, the Court finds convincing the testimony that Weidner likely felt comfortable attempting to

land at Craig because, at the time, he had only undertaken one missed approach (as opposed to two) and Craig was his "home" airport. Thus, the pilot's decision to attempt the landing at Craig does not necessarily establish that he would have gone forward with the approach into JIA even if he had been advised of JIA's actual weather conditions. *See also, Worthington,* 21 F.3d at 407 (finding "recovery may not be barred because Mr. Worthington attempted to land at the Jacksonville airport despite his awareness of deteriorating weather conditions").

the finder of fact determines that both plaintiff and defendant were guilty of negligence which was, in some degree, a legal cause of the injury to the plaintiff, the negligence of the defendant and that of the plaintiff should be apportioned and the damages award be apportioned thereon). The Eleventh Circuit has specifically countenanced the use of comparative negligence principles in a Florida airplane crash case against the government. *See Worthington,* 21 F.3d at 407.

Experts for both the plaintiffs and the government essentially agreed that several risk factors can lead to creating an environment which is ripe for spatial disorientation to occur. Those factors include weather, turbulence, night, formation flying, aircraft maneuvers, VFR–IFR transition, head movement, anxiety, distraction, fatigue, illness, alcohol, instrument failure, inexperience and medication.[34] Some of these factors admittedly overlap and any one or, more likely, some combination of these factors, can lead to spatial disorientation. Moreover, there is no precise formula as to which combination of these factors will cause spatial disorientation in a given situation. Nevertheless, in making my findings as to comparative negligence, I have attempted to determine which of these factors were present and whether the presence of a factor was due to a lack

of reasonable care on the part of the pilot, air traffic controllers, both, or neither. Finally, I have considered whether the evidence supports a finding that any particular factor should be weighed more heavily than others in my analysis.

There was no evidence that turbulence, formation flying or alcohol played any role in the pilot's spatial disorientation and I have therefore not considered those factors. I further find that instrument failure did not play a role here the pilot's own report of instrument failure was the only evidence of such failure and, given the testimony that pilots often erroneously report instrument failure during episodes of spatial disorientation,[35] the preponderance of evidence does not support a finding that instrument failure occurred here. I also find that, while Weidner was not highly experienced in flying in IFR conditions, the testimony about his solid performance in executing the missed approaches at St. Augustine and Craig in IFR conditions, his certification in IFR flying by the FAA, and the evidence that even experienced instrument-rated pilots become spatially disoriented at times, leads me to find that inexperience was not a significant factor in Weidner becoming spatially disoriented. Additionally, that it·was night is the fault of no one it was simply a risk factor that was present.[36]

---

**34.** The first twelve factors are listed on Defendant's Exhibit 27 at (unnumbered) page 4 and were discussed by medical experts for both sides. The Court also heard expert testimony about the last three factors instrument failure, inexperience and medication—and has determined based on this testimony that they can be additional risk factors for spatial disorientation. Although there was also testimony about stress and surprise being risk factors, these factors seem to be subsumed within the risk factors of anxiety, distraction, and fatigue and I do not therefore find stress or surprise to be independent factors. Finally, I find it important that the medical experts for both sides were in near agreement as to which

spatial disorientation risk factors were likely present here. *See* testimony of Dr. Michael Berry, Vol. VI at Tr. 257–59, 261, 273–92; Dr. Richard Boehme, Vol. IV at Tr. 243–48.

**35.** *See* testimony of Dr. Berry, Vol. VI at Tr. 259–61.

**36.** Pilot Weidner was rated by the FAA for nighttime flying and his log book reflects that he had over 200 hours of nighttime flight experience. Defendant's meteorology expert, Dr. Hoxit, testified that night had fallen and it was totally dark outside by 6:30 p.m. EST on December 12, 2001. Vol. VI at Tr. 166. Flight N7701J departed Fort Lauderdale at

The evidence does establish that the air traffic controllers' failure to provide the pilot with the correct weather led to the pilot being at a point in his final approach where the weather was worse than anticipated, thus preventing him from picking up any of the visual points on the ground that he would have expected to see. Additionally, because the weather was not what the pilot expected to find, he more likely than not engaged in early and frequent head movement by continuing to search for the ground, he more likely than not experienced anxiety as he failed to visually locate any ground contacts, he more likely than not experienced distraction when he diverted his focus from his instruments to the outside environment and he more likely than not engaged in additional aircraft maneuvers in attempting to maintain control of his aircraft. The negligence of the air traffic controllers in not providing accurate weather led to the presence of these factors.

However, having just missed two other approaches, Weidner's choice to fly to an airport with IFR conditions[37] while fatigued,[38] on medications and while ill[39] (rather than, for example, flying to Daytona which he knew had been experiencing VFR conditions during his flight, or asking air traffic controllers for a VFR alternative[40]), was also a failure of reasonable care[41] which substantially contributed to his spatial disorientation. *See Worthington*, 21 F.3d at 407 (suggesting that the pilot's decision to attempt a landing at JIA in deteriorating weather conditions could be a failure to exercise reasonable care (though, if so, it would go "to apportion, not bar, liability")).

I therefore find that the air traffic controllers' negligence substantially contributed to the presence of the spatial disorientation risk factors of weather, head movement, aircraft maneuvers, anxiety and distraction and that the pilot's own negligence substantially contributed to the

approximately 4:50 p.m. and air traffic controllers cleared the pilot for his instrument approach at St. Augustine at approximately 6:36 p.m. Thus, even the first landing was expected to be after nightfall.

37. Even Information Mike required flight in IFR conditions, with no guarantee of landing.

38. As discussed above, Weidner had left his house at about 6:00 a.m., had flown from St. Augustine to Fort Lauderdale, had worked a full day, had been flying on the return trip for over two hours and had just executed two missed approaches at two different airports. None of the expert pilots (all of whom had more flight experience than Weidner) had ever attempted a third IFR landing after two missed IFR approaches in actual (as opposed to training) conditions. *See, e.g.,* testimony of Schaefer, Vol. IV at Tr. 48, 99 (further stating that he had never heard of any single-engine flight attempting a third IFR landing); testimony of Dr. Boehme, Vol. IV at 244. *See also* testimony of Schaefer, Vol. IV at 17–20 (describing the demanding nature of flight in a single-pilot environment).

39. Based on the testimony of Dr. Berry (*see* Vol. VI at Tr. 290–92), I find medication and illness to be two independent risk factors in this case, both of which affect balance and which were substantial contributing factors to Weidner's spatial disorientation.

40. The record showed that Weidner had sufficient fuel to fly to a VFR alternative.

41. Indeed, pilots are specifically advised of the hazards of flying while ill, fatigued, or on medication. *See, e.g.,* Aeronautical Information Manual ¶ 8–1–1(b)(1) (advising pilots that "[i]llness can produce ... distracting symptoms that can impair judgment, memory, alertness, and the ability to make calculations" and that medication taken for such illness "itself may decrease pilot performance"); ¶ 8–1–1(e)(1) (advising pilots that "[f]atigue continues to be one of the most treacherous hazards to flight safety, as it may not be apparent to a pilot until serious errors are made").

presence of VFR–IFR transition, fatigue, medication and illness. Although the weighing of these factors for the purposes of apportioning comparative negligence is not an exact science, after careful and even painstaking deliberation, I find the FAA's negligence was the legal cause of 65% of this accident and the negligence of the pilot, Mr. Weidner, was the legal cause of 35% of this accident.

### III. Conclusion

I recognize (as the parties surely do) that we will never know for certain what actually occurred during the final moments of flight N7701J and what caused the plane to crash. Although I am required by the law to assess and quantify liability for this accident, the process of doing so is not reducible to a mathematical formula but, rather, reflects my best judgment based on the facts as I have found them proven by a preponderance of the evidence. I am certain that neither the air traffic controllers nor Mr. Weidner intentionally compromised the safety of this flight. Nonetheless, based on the evidence, it is more likely than not their combined failure to use reasonable care that led to this tragic accident.

Thus, I find the plaintiffs have proven by a preponderance of the evidence that the United States (through its agent, the FAA) is liable for this accident and that the government's negligence was 65% of the legal cause of the accident, the remaining 35% of the responsibility for the accident being due to the negligent actions of the pilot, Donald W. Weidner.